THE STATE OF OHIO, APPELLEE, *v.* APANOVITCH, APPELLANT.

[Cite as State *v.* Apanovitch (1987), 33 Ohio St. 3d 19.]

(No. 86-1746—Decided October 7, 1987.)

20

*John T. Corrigan,* prosecuting attorney, and *Jack H. Hudson,* for appellee.

*Charles R. Laurie, Jr.,* for appellant.

*Per Curiam.* We review this case pursuant to R.C. 2929.05(A) as in other cases. We must independently weigh the aggravating circumstances against any mitigating factors. We must also independently consider whether appellant's death sentence is disproportionate to the penalty in similar cases. For the reasons set forth below, we affirm the judgment of the court of appeals and uphold the sentence of death.

### I

In his first proposition of law, appellant contends that the trial court erred by admitting "state of mind" witnesses to offer hearsay testimony. Appellant also urges that it was error to permit one witness to testify when the trial court had knowledge that the witness would not offer any probative or substantive evidence.

Six witnesses testified as to the victim's state of mind. In general, these witnesses testified that the victim was fearful or apprehensive about "the person who was painting the house" who had a "pregnant wife," "the painter," "a big man" with a "wife that was pregnant," and "the painter." Only one witness, a neighbor to whom appellant also made "passes," could identify appellant by his full name.

Appellant contends these witnesses offered hearsay testimony which was improperly admitted by the trial court.

Ohio Evid. R. 803 provides the following hearsay exception, in pertinent part:

"(3) A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will."

In *United States* v. *Cohen*[1] (C.A. 5, 1980), 631 F. 2d 1223, the defendant offered the testimony of state-of-mind witnesses to demonstrate that he acted out of fear of his codefendants. In discussing Fed. Evid. R. 803(3), the court noted that the rule permitted the witnesses to relate any out-of-court statements Cohen had made to the effect that he was scared, anxious, or in any other state reflecting his then existing mental or emotional condition. However, the court also observed that the state-of-mind exception does not permit witnesses to relate any of the declarant's statements as to why he held a particular state of mind. Accordingly, the witnesses were allowed to offer testimony that Cohen said, "I'm scared," but not "I'm scared because Galkin threatened me." *Cohen, supra,* at 1225.

Finally, the testimony sought to be introduced must point towards the future rather than the past. When the state of mind is relevant it may be proved by contemporaneous declara-

---

[1] The federal rule dealing with state of mind witnesses is identical to the Ohio rule.

Evid. R. 803(3) operates as a vehicle for the admission of a statement such as, "I am afraid of X." 1 Weissenberger, Ohio Evid. (1985), Chapter 801 at 42, Section 803.32. Accord McCormick, Evidence (3 Ed. 1984) 853, Section 296. The critical requirement is that the statement refer to a present and not a past condition. Giannelli, Ohio Evidence Manual (1982), Article VIII at 36, Section 803.07. Where the statement does not relate to a "then existing" condition, it must be viewed as a narrative account formulated after time for reflection, and therefore it is not admissible under Evid. R. 803(3). Weissenberger, *supra,* at 40, Section 803.30.

tions of feeling or intent. *Shepard* v. *United States* (1933), 290 U.S. 96.

Accordingly, the testimony of state-of-mind witnesses, that the victim was fearful and apprehensive, was not inadmissible hearsay and was properly admitted.

In the second portion of his initial proposition of law, appellant challenges the testimony of Howard Hammon, claiming this witness did not offer probative or substantive testimony.

After Hammon informed prosecutors that he overheard appellant and another prisoner talking, the state attempted to call him as a witness. Apparently, Hammon had indicated to the prosecutor that appellant said that he might have committed the homicide but the state could never prove it. During voir dire, Hammon changed his testimony, stating that appellant had said to him, "Jeez, they are trying to convict me on circumstantial evidence."

The trial court initially refused to allow Hammon to testify. Nevertheless, the court subsequently determined that, in the interest of justice, the jury should hear his testimony. The court called Hammon as its own witness and allowed both parties to cross-examine him. The court did so by granting the state's motion to re-open its case for newly discovered evidence.

Appellant contends the trial court erred to his prejudice by allowing Hammon to testify when it was known that he would repudiate his prior statement, a statement not yet made to the jury.

In *State* v. *Adams* (1980), 62 Ohio St. 2d 151, 16 O.O. 3d 169, 404 N.E. 2d 144, paragraph four of the syllabus, we held that "a trial court possesses the authority in the exercise of sound discretion to call individuals as witnesses of the court." Evid. R. 614 also provides that a court may call witnesses on its own motion and allow each party to then cross-examine those witnesses. The state need not demonstrate surprise in order to cross-examine such a witness. *State* v. *Dacons* (1982), 5 Ohio App. 3d 112, 5 OBR 227, 449 N.E. 2d 507.

Our inquiry thus narrows as to whether the trial court abused its discretion when Hammon was called by the court as a witness. The term "abuse of discretion" connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary, or unconscionable. *State* v. *Adams, supra,* at 157, 16 O.O. 3d at 173, 404 N.E. 2d at 149.

As the court of appeals noted, the mere fact that Hammon's testimony offered little probative evidence of guilt does not permit a finding that the trial court abused its discretion. We believe the trial court's decision was not unreasonable, arbitrary, or unconscionable, although it might have been otherwise had Hammon testified during voir dire or had it been established that he falsified his testimony in order to secure a reduction in his prison sentence or for some other improper motive.[2]

For the foregoing reasons, we find no merit in appellant's first proposition of law.

## II

Appellant contends that the trial court should have granted his motion

---

[2] We emphasize that Hammon's improper motive for testifying was developed by defense counsel on cross-examination, after this witness was subjected to voir dire by counsel and after the trial court called him as the court's witness.

for judgment of acquittal pursuant to Crim. R. 29(A).

The standard for determining whether a motion for acquittal is properly denied is set forth in *State* v. *Bridgeman* (1978), 55 Ohio St. 2d 261, 9 O.O. 3d 401, 381 N.E. 2d 184, syllabus, as follows:

"Pursuant to Crim. R. 29(A), a court shall not order an entry of judgment of acquittal where the evidence is such that reasonable minds can reach different conclusions as to whether each material element of a crime has been proved beyond a reasonable doubt."

A motion for judgment of acquittal under Crim. R. 29(A) should be granted only where reasonable minds could not fail to find reasonable doubt. *State* v. *Bridgeman, supra*; *State* v. *Martin* (1985), 19 Ohio St. 3d 122, 130, 19 OBR 330, 337, 483 N.E. 2d 1157, 1165.

A review of the circumstantial evidence presented by the state leads us to conclude that reasonable minds could reach different conclusions as to whether each material element was proved beyond a reasonable doubt. This evidence includes the facts that (1) appellant had the same blood type as the perpetrator; (2) he had a scratch on the left side of his face consistent with that of a scratch from a fingernail; (3) appellant could not adequately account for his whereabouts on the night in question; (4) appellant's signed agreement to paint a portion of the victim's house was found on the kitchen table the day after the murder was discovered; (5) appellant was familiar with the peculiar layout of the victim's house; (6) appellant knew the victim and had made statements to others about his desire to have sexual relations with her; (7) the victim was fearful and apprehensive of appellant; (8) appellant spoke with the victim for roughly ten minutes at approximately 4:00 or 4:30 p.m. on the day of the murder. (The subject of the discussion, according to appellant, was the offer to paint the windowsills. A portion of one of the sills was used to stab the victim in the neck.); (9) appellant told the police that it did not mean anything if they found his fingerprints in the house, even though he had painted only the exterior of the house; and (10) appellant offered a variety of inconsistent stories about his whereabouts on the night of the murder.

Given the state of the record, we hold that the court of appeals correctly determined that while the evidence was not conclusive of guilt, it was sufficient to withstand a motion for acquittal under Crim. R. 29.

Appellant's next proposition of law, that his conviction was against the manifest weight of the evidence, is also not well-taken. In *State* v. *Kulig* (1974), 37 Ohio St. 2d 157, 66 O.O. 2d 351, 309 N.E. 2d 897, it was stated in the syllabus that:

"Circumstantial evidence relied upon to prove an essential element of a crime must be irreconcilable with any reasonable theory of an accused's innocence in order to support a finding of guilt."

A reviewing court will not reverse a jury verdict where there is substantial evidence upon which a jury could reasonably conclude that all elements of the offense have been proved beyond a reasonable doubt. *State* v. *Eley* (1978), 56 Ohio St. 2d 169, 10 O.O. 3d 340, 383 N.E. 2d 132, syllabus. In *State* v. *Mattison* (1985), 23 Ohio App. 3d 10, 23 OBR 43, 490 N.E. 2d 926, the court noted eight factors in determining whether a decision is against the manifest weight of the evidence. These include whether the evidence was uncontradicted, whether a witness was impeached, what was *not* proved, that

the reviewing court is not required to accept the incredible as true, the certainty of the evidence, the reliability of the evidence, whether a witness' testimony is self-serving, and whether the evidence is vague, uncertain, conflicting, or fragmentary.

Reviewing the evidence as a whole, the state provided sufficient evidence to allow a jury to conclude that appellant was guilty of the crimes beyond a reasonable doubt. Accordingly, his conviction was not against the manifest weight of the evidence and this proposition of law is overruled.

## III

Appellant further contends he was denied a fair trial because of the prosecutor's behavior at trial when questioning witnesses and during closing argument.

The conduct of a prosecuting attorney during trial cannot be made a ground of error unless the conduct deprives defendant of a fair trial. *State v. Maurer* (1984), 15 Ohio St. 3d 239, 266, 15 OBR 379, 402, 473 N.E. 2d 768, 793. Here, the prosecutor's questioning cannot be characterized as denying appellant a fair trial. Improper questions were properly objected to and objections were often sustained by the trial court. The prosecutor did not embark on or embrace a pattern of repeated or egregious abuse of examination or cross-examination.

The closing argument at the guilt phase presents a somewhat more difficult determination. It is improper for an attorney to express his personal belief or opinion as to the credibility of a witness or as to the guilt of the accused. *State v. Smith* (1984), 14 Ohio St. 3d 13, 14, 14 OBR 317, 318, 470 N.E. 2d 883, 885. In the case at bar, the prosecutor termed the testimony of one witness deceitful, which characterization was objected to and sustained by the trial court. Further, the

prosecutor made an incorrect statement by "reminding" the jury that a defense witness said he had six or seven drinks every morning when in fact the witness testified that such was not the case.

Appellant, however, did not correct or object to this misstatement. He waived his closing argument and in doing so, for what appeared to be tactical reasons, he waived the opportunity to rebut the state's theory of events proffered by the prosecutor. Pursuit of a deliberate trial strategy carries risks as well as benefits. Further, the jury was properly instructed that closing arguments were not to be considered as evidence.

Some latitude and freedom of expression are permitted for closing argument. *State v. Woodards* (1966), 6 Ohio St. 2d 14, 26, 35 O.O. 2d 8, 14, 215 N.E. 2d 568, 578. Thus, the closing argument of the prosecutor did not deprive appellant of a fair trial.

## IV

Appellant next maintains he was denied a fair trial when the trial court permitted continuation of closing argument by the state after appellant waived closing argument.

The state had apparently decided to split final argument between two prosecutors. After the first prosecutor concluded his argument, the trial court called on defense counsel. Appellant's counsel requested permission to approach the bench. Defense counsel stated that he waived final argument and, because there was no argument to rebut, the state was not entitled to further argument.

The prosecutors protested that they had not finished their argument. The trial court, after a lengthy debate, concurred and permitted the second prosecutor to proceed with the second portion of closing argument. There-

after, appellant again waived closing argument.

R.C. 2945.10(G) permits a trial court to deviate from the order of the proceedings listed in that section. In *State* v. *Jenkins* (1984), 15 Ohio St. 3d 164, 15 OBR 311, 473 N.E. 2d 264, the court held, in paragraph eleven of the syllabus, that a decision to vary the order of proceedings is within the sound discretion of the trial court. In order to demonstrate the existence of unfairness or prejudice arising from the trial court's order varying the trial procedure, appellant must overcome a heavy burden of proof. Accord *State* v. *Bayless* (1976), 48 Ohio St. 2d 73, 2 O.O. 3d 249, 357 N.E. 2d 1035.

Here appellant has not demonstrated any unfairness or prejudice arising from the trial court's decision to allow the state to present its closing argument in this particular fashion, inasmuch as he had the opportunity to rebut the prosecutor's argument with his own closing argument. However, he specifically waived his argument and thus waived an opportunity to offer his own version of events.

V

Appellant next argues that allowing the submission into evidence of items unrelated to the crime, as well as gruesome photographs, denied him a fair trial.

According to appellant, the admission of pieces of the wooden windowsill, wooden chips, and the cancelled checks was used to prove "minor" facts and was of no probative value. We would note that the victim was stabbed in the neck with a portion of the windowsill. Though the cause of death was by strangulation, the windowsill was an important part of the crime scene. Likewise, the introduction of the cancelled checks assisted the jury by helping to establish the relationship between the victim and appellant.

A trial court has broad discretion in the admission and exclusion of evidence. Unless the trial court has clearly abused its discretion, an appellate court should not interfere in its determination. *State* v. *Hymore* (1967), 9 Ohio St. 2d 122, 128, 38 O.O. 2d 298, 302, 224 N.E. 2d 126, 130. Here, the admission of the windowsill, wood chips and checks was not unreasonable, arbitrary, or unconscionable. *State* v. *Adams, supra*.

The admission of the photographs is also not a ground for reversal. Twenty-nine photographs depicting the body of the victim were introduced. Of these, approximately fifteen (exhibit Nos. 4, 7, 8, 10, 11, 21, 22, 23, 24, 25, 55, 56, 71, 72, 74) could be characterized as "gruesome."

However, the fact that a photograph may be considered gruesome is not, in and of itself, grounds for preventing its introduction into evidence. As was stated in *State* v. *Maurer, supra,* at paragraph seven of the syllabus, "[p]roperly authenticated photographs, even if gruesome, are admissible in a capital prosecution if relevant and of probative value in assisting the trier of fact to determine the issues or are illustrative of testimony and other evidence, as long as the danger of material prejudice to a defendant is outweighed by their probative value and the photographs are not repetitive or cumulative in number." See, also, *United States* v. *Kilbourne* (C.A. 4, 1977), 559 F. 2d 1263.

In the instant case, the photographs were utilized to aid the jury in understanding the testimony of various witnesses and forensic experts concerning the rape and ultimate slaying of the victim. In view of the state of the record, we reject appellant's argument that the photographs were so cumulative and repetitive that the trial

court abused its discretion by allowing the photographs to be admitted into evidence or that a material prejudice was occasioned thereby. Cf. *State* v. *Morales* (1987), 32 Ohio St. 3d 252, 513 N.E. 2d 267.

## VI

Appellant's next challenge centers upon Crim. R. 16 and the regulation of discovery in criminal proceedings. Apanovitch argues his statement to Detective Zalar to the effect that police should not be surprised to find his fingerprints in the house because he had previously been through the house was not provided to him on discovery.

Crim. R. 16(B)(1)(a)(ii) specifies that written summaries of any oral statement made by a defendant are subject to disclosure by the prosecuting attorney. The duty to disclose is a continuing one. Crim. R. 16(D). Where the prosecutor fails to comply, a trial court may order the discovery, grant a continuance, prevent admission of the undisclosed evidence, or may make other orders as it deems just. Crim. R. 16(E)(3). See, *e.g.*, *State* v. *Edwards* (1976), 49 Ohio St. 2d 31, 3 O.O. 3d 18, 358 N.E. 2d 1051.

In *State* v. *Parson* (1983), 6 Ohio St. 3d 442, 6 OBR 485, 453 N.E. 2d 689, we held:

"Where, in a criminal trial, the prosecution fails to comply with Crim. R. 16(B)(1)(a)(ii) by informing the accused of an oral statement made * * * to a law enforcement officer, and the record does not demonstrate (1) that the prosecution's failure to disclose was a willful violation of Crim. R. 16, (2) that foreknowledge of the statement would have benefited the accused in the preparation of his defense, or (3) that the accused was prejudiced by admission of the statement, the trial court does not abuse its discretion under Crim. R. 16(E)(3) by permitting such evidence to be admitted."

Here, the trial court determined that the prosecution did not have previous knowledge of this statement. Appellant has not demonstrated that the trial court's determination in this regard constituted an abuse of discretion, nor has he demonstrated "how foreknowledge of the nondisclosed statement would have benefited him in the preparation of his defense," or how he may have otherwise been prejudiced by the nondisclosure. *Id.* at 445, 6 OBR at 488, 553 N.E. 2d at 692.

Accordingly, the trial court did not abuse its discretion in admitting the testimony even though it was not supplied during discovery.

## VII

Appellant next assails the Ohio death penalty procedure presenting a variety of constitutional challenges. Specifically, he contends that the state must demonstrate a compelling state interest in applying the death penalty; that the death penalty does not serve as a deterrent to others; that the state may achieve its goals through a less onerous means, such as life imprisonment; that proof beyond all doubt is required for both a conviction and the imposition of the death penalty; and that if the evidence does not foreclose all doubt of a defendant's guilt then this must be considered as a mitigating factor.

These propositions of law have been previously considered and determined by this court. They are overruled on the authority of *State* v. *Jenkins, supra,* and its progeny.

## VIII

It becomes necessary for this court to independently weigh the aggravating circumstances of which appellant was convicted against the mitigating factors.

Here, appellant chose not to introduce any of the mitigating factors

listed in R.C. 2929.04(B). Rather, he presented further evidence in an attempt to instill in the jury a reasonable doubt of guilt, with the apparent aim of persuading the jury that the death penalty should not be imposed where some doubt as to guilt remained. The proclamation of innocence is a factor relevant to the issue of whether the sentence should be imposed. *State v. Buell* (1986), 22 Ohio St. 3d 124, 142, 22 OBR 203, 218-219, 489 N.E. 2d 795, 811.

The fact, however, that the evidence against appellant was all circumstantial is not to be considered as a mitigating factor. A conviction based on purely circumstantial evidence is no less sound than a conviction based upon direct evidence. Consideration of circumstantial evidence as a mitigating factor would inevitably lead to undercutting the underlying conviction itself by implying that a conviction based on circumstantial evidence is inherently less reliable than a conviction based on direct evidence.

In fact, a conviction based upon purely circumstantial evidence may be just as reliable as a conviction based on direct evidence, if not more so. *Michalic v. Cleveland Tankers, Inc.* (1960), 364 U.S. 325, 330. See, also, *Rogers v. Missouri Pacific RR. Co.* (1957), 352 U.S. 500, 508, at fn. 17; *The Robert Edwards* (1821), 19 U.S. (6 Wheat.) 187, 190.

As was recognized in *State v. Graven* (1978), 54 Ohio St. 2d 114, 118-119, 8 O.O. 3d 113, 116, 374 N.E. 2d 1370, 1373-1374:

"* * * [I]t is axiomatic that criminal conduct may be and, in many instances, can only be proved by circumstantial evidence. However, the circumstantial evidence relied upon to prove an essential element of the crime must be irreconcilable with any *reasonable* theory of the accused's innocence

in order to support a finding of guilty. *State v. Kulig* (1974), 37 Ohio St. 2d 157.

"Thus, where circumstantial evidence is relied upon to prove elements of the crime, as in the cause *sub judice,* the jury must find it to be of such a conclusive and persuasive force that it excludes every reasonable hypothesis of innocence. This determination of the reasonableness of a hypothesis as a jury prerogative was recognized by the Supreme Court of the United States in *Holland v. United States* (1954), 348 U.S. 121, wherein the court stated, at 140:

" 'Circumstantial evidence in this respect is intrinsically no different from testimonial evidence. Admittedly, circumstantial evidence may in some cases point to a wholly incorrect result. Yet this is equally true of testimonial evidence. In both instances, a jury is asked to weigh the chances that the evidence correctly points to guilt against the possibility of inaccuracy or ambiguous inference. In both, the jury must use its experience with people and events in weighing the probabilities. * * *'

"Similarly, language in *State v. Sheppard, supra* (165 Ohio St. 293), likewise implies that the determination of reasonableness includes a determination of whether the hypothesis is reasonable in view of the weight and credibility that the jury gives to the evidence. (See *State v. Williams* [1976], 47 Ohio App. 2d 330, 336.) In paragraph six of the syllabus in *State v. Sheppard, supra,* this court stated:

" 'Where circumstantial evidence alone is relied upon in the proof of any element of a crime, and the jury finds that there is a reasonable hypothesis of innocence, after considering all the evidence, it is its duty to acquit; however, where the *jury finds,* after full deliberation, that there is *no reasonable*

*hypothesis of innocence based on the facts as it finds them to be,* and the facts which it finds are irreconcilable with any reasonable hypothesis other than guilt, it is its duty to convict.' (Emphasis added.)

"Thus, once the jury has reached its decision, an appellate court, in a case where circumstantial evidence is relied upon, will reverse only where the evidence is insufficient as a matter of law to enable the jury to exclude a reasonable hypothesis of innocence."

Having reviewed the record in its entirety, we conclude that the circumstantial evidence presented was not, as a matter of law, insufficient to enable the jury to exclude a reasonable hypothesis of innocence.

Turning to the weighing process, here the victim did not induce or facilitate the attack. There was no evidence that the appellant was under duress, coercion, or strong provocation, or that he lacked substantial capacity to appreciate the criminality of his conduct or conform his conduct to the requirements of the law. His age is not a mitigating factor. With regard to lack of significant history of prior criminal convictions, the trial court did not include such a history. However, pursuant to a journal entry dated January 11, 1985, appellant stipulated to specification three of Count I of the indictment and specification one of Counts II and III (previously convicted of aggravated robbery and robbery). Finally, appellant maintained his innocence of the crimes charged in the indictment.

On review of the entire record we find that the aggravating circumstances of committing or attempting to commit aggravated burglary and committing or attempting to commit rape outweigh the mitigating factors beyond a reasonable doubt.

All that remains is to determine whether the death sentence here is disproportionate to the penalty in similar cases. Since the overhaul of the Ohio death penalty scheme in October 1981, this court has addressed twenty-three cases involving the imposition of the death penalty. Beginning in *State* v. *Jenkins, supra,* this court upheld the death sentence where a police officer was murdered during the course of a robbery. In *State* v. *Steffen* (1987), 31 Ohio St. 3d 111, 31 OBR 273, 509 N.E. 2d 383; *State* v. *Rogers* (1986), 28 Ohio St. 3d 427, 28 OBR 480, 504 N.E. 2d 52; *State* v. *Buell* (1986), 22 Ohio St. 3d 124, 22 OBR 203, 489 N.E. 2d 795, and *State* v. *Maurer, supra,* death sentences were upheld involving rape or sexually related murders. Of these cases, the instant appeal is virtually on all fours with *State* v. *Steffen, supra.* A review of that case, as well as all other cases where the imposition of the death penalty has been upheld since the holding in *State* v. *Jenkins,* demonstrates that the sentence of death imposed in this case is neither excessive nor disproportionate to the penalties imposed in similar cases. Accordingly, we agree with the court of appeals that the penalty imposed herein is entirely appropriate.

IX

In conclusion we find no merit to the propositions of law raised by appellant concerning the propriety of the proceedings below, and we likewise reject his constitutional challenges leveled at the death penalty scheme. Next, we conclude without hesitation that the aggravating circumstances appellant was convicted of committing outweigh any and all mitigating factors presented on appellant's behalf beyond a reasonable doubt. Finally, it is the judgment of this court that the imposition of the death sentence is neither excessive nor disproportionate to the penalty imposed in similar cases. Accordingly, and for all of the fore-

going reasons, the judgment of the court of appeals affirming the conviction and sentence of death is hereby affirmed.

*Judgment affirmed.*

MOYER, C.J., HOLMES and WRIGHT, JJ., concur.

DOUGLAS, J., concurs in judgment only.

SWEENEY, LOCHER and H. BROWN, JJ., concur in part and dissent in part.

HERBERT R. BROWN, J., concurring in part and dissenting in part. In the main I agree with the disposition the majority makes with respect to the errors assigned by the defendant-appellant. However, I strongly disagree with the affirmation of the death sentence. I dissent from the imposition of the death sentence because the evidence of guilt in this case, while sufficient to meet the various standards which an appellate court must use to measure legal error, is far from overwhelming.

The majority recognizes: "A review of the circumstantial evidence presented by the state leads us to conclude that *reasonable minds could reach different conclusions* as to whether each material element was proved beyond a reasonable doubt." (Emphasis added.) The majority further says: "Given the state of the record, we hold that the court of appeals correctly determined that *while the evidence was not conclusive of guilt, it was sufficient to withstand a motion for acquittal* under Crim. R. 29." (Emphasis added.)

Our duty, as imposed by R.C. 2929.05, does not stop with the review of legal error. Before approving a sentence of death, we are required by that statute to make two additional determinations. First, we must "weigh all of the facts and other evidence disclosed in the record in the case and consider the offense and the offender to determine whether the aggravating circumstances the offender was found guilty of committing outweigh the mitigating factors in the case." Second, we must determine "whether the sentence of death is appropriate."

With regard to our second obligation the statutory mandate includes this language: "The court of appeals or *the supreme court shall affirm a sentence of death only if the particular court is persuaded from the record* that the aggravating circumstances the offender was found guilty of committing outweigh the mitigating factors present in the case and *that the sentence of death is the appropriate sentence in the case.*" (Emphasis added.)

This mandate goes beyond a bare sufficiency of the evidence test and it is not discharged by a mere proportionality review. The legislature has made our responsibility in reviewing the sentence in a capital case different from that in any other criminal case. In essence, we are constituted as a super jury to review the record and to decide whether the death sentence is appropriate. We are not bound, as in other cases, by the findings of fact made by the trier of fact. *We must be "persuaded."*

Can anyone quibble with the idea that lack of certainty as to a defendant's guilt (even if the evidence is sufficient as a matter of law) should be a consideration in deciding whether the death penalty is appropriate? In this case, there is a substantial possibility that the defendant *may* not be guilty. I emphasize the word "may," because, as indicated, I believe the record does pass muster as to legal sufficiency.

I turn now to the evidence. The first consideration is the state's contention that the defendant has the same blood type as that of the assailant. This was an important part of the case presented by the state at trial. The state called a medical technologist who had no sample of seminal fluid from the victim's vagina but did have vaginal and oral swabs from which she found the presence of spematozoa. From her testing, she was able to determine that the swabs came from a person in blood group A. The defendant is in blood group A. What troubles me is that the pathological report indicates that the *victim* was also in blood group A.

It is recognized that in order to determine the blood type of an assailant in a rape case, where oral and vaginal swabs have been taken from the victim's body, *medical evidence must identify an antigen which was known not to have been produced by the victim herself.* See Gaensslen & Camp, Forensic Serology: Analysis of Bloodstains and Body Fluid Stains, 2 Forensic Sciences (Wecht Ed. 1987) 29-83. If the victim was a secretor,[3] the recovery of a type A antigen from the swab obtained from the victim (who was herself a type A) offers no information concerning the blood type of the assailant, because *the recovered antigens could have as easily originated from the victim as from the assailant.* As is stated by Gaensslen & Camp, *supra:*

"In vaginal swabs or washings from sexual assault victims, *there is always a mixture of the vaginal fluids of the victim and the seminal fluid of the perpetrator* (assuming that semen is present). For this reason, the *victim's blood type and secretor status must be determined* in order to know what substances found in the samples might be from the semen. In many cases, we cannot tell anything about the blood group of the perpetrator because the seminal blood group substances are masked by those of the victim's secretions." (Emphasis added.) *Id.*

Thus, where semen itself was not specifically found, and tests were conducted by use of oral and vaginal swabs, it was essential to identify the blood type and secretor status of the victim.[4] In sum, it appears to me that the state failed to prove that the defen-

---

[3] In this case the state did not determine whether the victim was a secretor. However, the medical technologist testified that eighty percent of all people are secretors, so there is an eighty percent chance that she was.

[4] It is surprising, in view of scientific medical advances, that the state simply proceeded with an ABO bloodgrouping analysis after finding the presence of sperm from the swabs. As noted by Gaensslen & Camp, *supra:* "There is a wide range of genetic markers in human blood and body fluids * * * [which] can, in many cases, greatly limit the number of people who might have deposited the stains." *Id.* at 29-5 to 29-6. For instance, aside from ABO testing, seminal-vaginal mixtures can be examined for phosphoglucomutase (PGM) isoenzymes to provide a degree of individualization as to the perpetrator. Although this procedure may not necessarily help identify the rapist, due to a masking of the seminal type by vaginal secretions, we do not know whether the state even attempted to utilize this procedure in the instant case.

Further, to address the problem of sex offender identification, a test known as the DNA comparison test is available. See Giusti, Baird, Pasquale, Balazs & Glassberg, Application of Deoxyribonucleic Acid (DNA) Polymorphisms to the analysis of DNA Recovered from Sperm (1986), 31 J. of Forensic Sciences 409. In this test, the masking problems inherent in ABO blood grouping and HLA testing are virtually nonexistent, since the analysis is conducted

dant's blood type was the same as that of the assailant.[5]

Another piece of the evidence which disturbs me is the human hair which was found on the back of the victim's hand. The victim's hands had been covered with plastic bags in the coroner's office in order to prevent disturbing potential evidence, which would be further scrutinized at the crime laboratory. When the plastic bags were removed from the victim's hands, a human hair was discovered. *Further analysis of the hair demonstrated that it did not originate from either the victim or the defendant.* At trial, the state argued that it is not uncommon for police or crime scene personnel to lose a hair, which is later recovered and thought to be of evidentiary value. While this may have been the case, the better approach would have been to have the hair analyzed against all crime scene personnel who could have deposited it. Such an elimination procedure is not overly burdensome given the penalty sought to be extracted by the state.

The balance of the evidence presented by the state was circumstantial. It included the following: (1) the defendant had a scratch on the left side of his face consistent with that of a fingernail scratch, but *no tissue was found under the victim's fingernails*; (2) the defendant had painted a portion of the victim's duplex and a copy of the contract for painting was found on the kitchen table the day after the murder was discovered; (3) the defendant was familiar with the layout of the victim's house; (4) the victim was apprehensive about the defendant; (5) the defendant spoke with the victim for about ten minutes in the afternoon preceding the murder about painting her windowsills, and a portion of one of the sills was used to stab the victim in the neck; and (6) the defendant offered several inconsistent stories about his whereabouts on the night of the murder between the hours of 9:15 p.m. and 12:45 a.m.

A conviction may be affirmed upon circumstantial evidence and even upon a record with as many holes as this one. But in this case, I am not persuaded that the death sentence is appropriate, even though the crime would merit that penalty if there were no doubt as to the defendant's guilt. Accordingly, I would affirm the defendant's conviction, but remand the case to the trial court for imposition of a life sentence. See *State* v. *Penix* (1987), 32 Ohio St. 3d 369, 513 N.E. 2d 744.

SWEENEY and LOCHER, JJ., concur in the foregoing opinion.

---

upon the sperm itself, a quantity of which was recovered in the instant case. See, also, Kanter, Baird, Shaler & Balazs, Analysis of Restriction Fragment Length Polymorphisms in Deoxyribonucleic Acid (DNA) Recovered from Dried Bloodstains (1986), 31 J. of Forensic Sciences 403-408. A further advantage of the DNA comparison test is that the procedure can, as of this date, still be attempted by the state in the case *sub judice* given the stability of the material for a period of four or more years. See Butzel, Genetics in the Courts (1987) 611. It is unfortunate that the state failed to utilize these procedures, which could have made the issue of this defendant's guilt or innocence far less murky.

[5] Even if the proof established the assailant as being in blood group A, such is of only moderate weight as circumstantial evidence. According to the state's medical technologist, that group would include approximately thirty-two to thirty-five percent of the male population in Cuyahoga County. (See, also, Gaensslen & Camp, *supra,* at 29-83 to 29-84.)