[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] JUDGMENT ENTRY.
This appeal, considered on the accelerated calendar under App.R. 11.1(E) and Loc.R. 12, is not controlling authority except as provided in S.Ct.R.Rep.Op. 2(G)(1).
Appellant Stanley Waller appeals his conviction for the aggravated murder and aggravated robbery of Marilyn Kendricks. Waller claims that his convictions were against the manifest weight of the evidence, in part, because the trial court admitted hearsay statements of Kendricks.
Kendricks was found in the bedroom of her locked house, kneeling over the bed, bludgeoned to death. The contents of her purse were spread over her dining room table, devoid of cash. She had been paid the day before the incident and had been seen with money the evening that she was murdered. Waller was her live-in boyfriend.
The night of the murder, Kendricks told her daughter that she was miserable and that she wanted out of her relationship with Waller. Later that evening she told her sister, Catherine Braswell, and her sister's friend, Clinton Taylor, that she wanted to end the relationship with Waller and said that she feared him.
Kendricks had arrived at her sister's house at approximately 6:40 p.m. with a fifth of Hennessy cognac. Kendricks, Braswell, and Taylor drank some of the alcohol. At about 8:00 p.m., Kendricks received a telephone call from Waller. After hanging up the telephone, she expressed her fear of Waller. She left the house at 8:30 p.m. She took the cognac, but left her keys and sunglasses, stating that she might return. In response to Braswell's request, Kendricks agreed to call when she got home. After about twenty minutes had passed with no call, Braswell called Kendricks's house. Waller answered the telephone and said that Kendricks was taking a bath and hung up.
Braswell tried calling several times, but received no answer. She called other family members to express her concern. They went to Kendricks's locked house and tried to gain entrance. Concerned that they received no answer to their knocking, and seeing that all the lights in the house were on and that the contents of Kendricks's purse were spread on the dining room table, they called the police. A police officer removed a screen from an unlocked window. A family member crawled through the window and unlocked the front door. Kendricks's body was found in an upstairs bedroom.
A small sledgehammer lay on the bed. It was later determined that Kendricks had suffered at least seven potentially fatal blows to the head and that the blows could have been inflicted by someone using the sledgehammer. Kendricks's blood was found on the sledgehammer. Waller's glasses were found on the bedroom floor, his fingerprint was found on a soda can in the bedroom, and his semen was found in Kendricks's vagina.
Beulah George, a female friend of Waller's, testified that he had been at her house at 4:30 the afternoon preceding Kendricks's murder, smoking crack cocaine. He left between 7:00 and 8:00 p.m., stating that he was going to get some money. When he left he was wearing the eyeglasses that he always wore. George expected him to be gone for only a short time. He did not return until 9:30 p.m. When he returned, he was wearing the same clothes as before, but was not wearing his eyeglasses. When she asked about the length of time he had been gone, Waller explained his lengthy absence by stating that he had to take Kendricks to the airport. He returned with at least five packs of cigarettes, half a fifth of Hennessy cognac, and a twelve-pack of beer. Waller made a call and left to meet someone in order to purchase more crack. He returned in twenty minutes with $60 worth of crack.
In the early morning hours, another friend of George's rang the doorbell. Despite Waller's request that she not respond, George went to her door and let in a friend. When George and her friend came back in, they found Waller sitting in the bathroom with the lights out, smoking a cigarette. When he left for the night, Waller told George that he would call her later that day to make arrangements to meet. He did not call. The police subsequently located him in Florida.
There was testimony that Kendricks's bathtub had not been used. There was testimony that Waller did not know Braswell's telephone number. A note for Waller written by Kendricks earlier on the night of her murder, expressed her concern about the relationship. The note was found in the house and provided Waller with both Braswell's number and the fact that Kendricks would be there that evening. There was no evidence of Kendricks's blood on Waller's clothes or in his car. There was evidence that it was possible that the murderer would not be splashed with Kendricks's blood. There was no evidence of Waller's blood on the sledgehammer.
In evaluating a challenge to the weight of the evidence, this court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses and determine whether the trial court clearly lost its way in resolving conflicts in the evidence and created a manifest miscarriage of justice entitling the defendant to a new trial.[1]
We conclude that Kendricks's statements concerning her fear of Waller were not improperly admitted. Evid.R. 803(3) allows, as an exception to the hearsay rule, the admission of statements concerning a declarant's then-existing state of mind, emotion, sensation, or physical condition. The evidence did not provide the reasons underlying Kendricks's state of mind and it pointed forward in time.[2] The testimony was admissible to show that Kendricks was fearful and apprehensive.
Further, reviewing the evidence under the manifest-weight standard, we cannot conclude that the jury created a manifest miscarriage of justice.
Therefore, the judgment of the trial court is affirmed.
Further, a certified copy of this Judgment Entry shall constitute the mandate, which shall be sent to the trial court under App.R. 27. Costs shall be taxed under App.R. 24.
Painter, P.J., Doan, and Hildebrandt, JJ.
[1] See State v. Martin (1983), 20 Ohio App.3d 172, 175, 485 N.E.2d 717,720.
[2] See State v. Apanovitch (1987), 33 Ohio St.3d 19, 514 N.E.2d 394;State v. Sutorius (1997), 122 Ohio App.3d 1, 702 N.E.2d 1.