*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 11a0154p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

ANTHONY C. APANOVITCH,

        *Petitioner-Appellant,*

    *v.*

DAVID BOBBY, Warden,

        *Respondent-Appellee.*

No. 09-4333

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 91-02221—John R. Adams, District Judge.

Argued: February 28, 2011

Decided and Filed: June 8, 2011

Before: BOGGS, MOORE, and ROGERS, Circuit Judges.

_____

## COUNSEL

_____

**ARGUED:** Dale A. Baich, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Phoenix, Arizona, for Appellant. Laurence R. Snyder, OFFICE OF THE OHIO ATTORNEY GENERAL, Cleveland, Ohio, for Appellee. **ON BRIEF:** Dale A. Baich, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Phoenix, Arizona, Mark R. DeVan, BERKMAN, GORDON, MURRAY & DeVAN, Cleveland, Ohio, for Appellant. Laurence R. Snyder, OFFICE OF THE OHIO ATTORNEY GENERAL, Cleveland, Ohio, for Appellee.

_____

## OPINION

_____

BOGGS, Circuit Judge. Anthony Apanovitch, an Ohio death-row inmate, appeals the district court's dismissal of his petition for a writ of habeas corpus. Apanovitch argues that he was prejudiced at his 1984 trial by the prosecution's withholding of favorable evidence, in violation of *Brady v. Maryland*, 373 U.S. 83

1

(1963).  It is clear that the prosecution wrongly withheld from Apanovitch favorable evidence.  The state's conduct was irresponsible, and that conclusion is punctuated here, in the context of the capital trial.  However, the state's conduct was not—in this case—unconstitutional, and we affirm.

I

This is the second time that Apanovitch's habeas petition has come before us on appeal.  A thorough description of its complex procedural and factual history can be found in this court's first opinion, *Apanovitch v. Houk*, 466 F.3d 460 (6th Cir. 2006).  Accordingly, we provide only a brief summary here.

Mary Anne Flynn was brutally raped and murdered in her Cleveland home on August 23, 1984.  Semen, mixed with other bodily fluids, was found inside Flynn's mouth and vagina.  Investigators determined that the fluids were from someone who secretes blood type A.  No physical traces of the killer were otherwise found at the scene.  However, police soon began to suspect Apanovitch, who had recently performed house-painting services for Flynn.  After police completed their investigation, a grand jury indicted Apanovitch for the crime on October 2, 1984.

The trial commenced on November 28, 1984, and various pieces of circumstantial evidence of Apanovitch's guilt were introduced to the jury.  The Ohio Supreme Court summarized the state's evidence against Apanovitch as follows:

> (1) [Apanovitch] had the same blood type as the perpetrator; (2) he had a scratch on the left side of his face consistent with that of a scratch from a fingernail; (3) [Apanovitch] could not adequately account for his whereabouts on the night in question; (4) [Apanovitch's] signed agreement to paint a portion of the victim's house was found on the kitchen table the day after the murder was discovered; (5) [Apanovitch] was familiar with the peculiar layout of the victim's house; (6) [Apanovitch] knew the victim and had made statements to others about his desire to have sexual relations with her; (7) the victim was fearful and apprehensive of [Apanovitch]; (8) [Apanovitch] spoke with the victim for roughly ten minutes at approximately 4:00 or 4:30 p.m. on the day of the murder. (The subject of the discussion, according to appellant, was the offer to paint the windowsills. A portion of one of the

sills was used to stab the victim in the neck.); (9) [Apanovitch] told the police that it did not mean anything if they found his fingerprints in the house, even though he had painted only the exterior of the house; and (10) [Apanovitch] offered a variety of inconsistent stories about his whereabouts on the night of the murder.

*State v. Apanovitch*, 514 N.E.2d 394, 399 (1987). In addition, a detective who testified about Apanovitch's statement regarding his fingerprints in the house also testified that Apanovitch requested that he be notified "when" he is indicted. The jury returned a guilty verdict on December 14, 1984. On January 8, 1985, Apanovitch was sentenced to death.

Apanovitch appealed his conviction in state court, and the Ohio Supreme Court affirmed his conviction, in a 4–3 decision, in 1987. *Id*. at 404. Apanovitch next filed a post-conviction petition in state court. The Ohio Supreme Court upheld the dismissal of that appeal in 1991. *State v. Apanovitch*, 574 N.E.2d 1089 (Table). Through these proceedings, Apanovitch become aware that the prosecution had failed, at the time of his trial, to disclose to him various pieces of exculpatory evidence. That failure—in disregard of a well-established obligation—is the reason why, nearly twenty-seven years after Apanovitch's conviction, we must pass judgment on its constitutionality here.

On November 1, 1991, Apanovitch filed a petition for a writ of habeas corpus in the United States District Court for the Northern District of Ohio. While the habeas proceeding was pending, the Ohio Supreme Court ordered the City of Cleveland to release to Apanovitch various documents relating to its investigation of Flynn's murder. Arguing that this new evidence supported the *Brady* claims he made in his habeas petition, Apanovitch moved the district court to include it in the record. Without addressing the issue, the district court dismissed Apanovitch's habeas petition in 1993. Apanovitch filed a timely appeal in this court and, at around the same time, a second post-conviction petition in state court. In 1994, this court granted Apanovitch's request to hold his habeas appeal in abeyance while the state proceeding was pending. The final state proceeding came to an end on December 20, 1996, with Apanovitch's conviction

still intact, *State v. Apanovitch*, 673 N.E.2d 146 (Table) (Ohio 1996), and Apanovitch's habeas appeal resumed.

After unaccountably taking no action on the appeal for nearly eight years, this court ultimately reversed in part the district court's 1993 judgment. The panel held that the district court abused its discretion by not expanding the record to include the newly released evidence. *Apanovitch*, 466 F.3d at 490. The panel also held that Apanovitch established, as to three of his *Brady* claims, that the prosecution had withheld favorable evidence, and remanded to the district court to consider the question of prejudice in light of the new evidence.[1] *Id*. at 477–82. In addition, the panel ordered that the district court consider newly available DNA evidence in light of Apanovitch's remaining claims of actual innocence. *Id*. at 489–90.

On remand, the district court ordered the DNA testing and, after considering its result, again dismissed Apanovitch's petition. *Apanovitch v. Houk*, 2009 WL 3378250 (N.D. Ohio Aug. 14, 2009). The district court considered the new DNA evidence, which was highly inculpatory,[2] to hold that Apanovitch was not prejudiced under *Brady*, and, in the alternative, reached the same conclusion without considering the new DNA evidence. *Id*. at \*12–\*13. On appeal, Apanovitch argues that the district court wrongly held that he was not prejudiced under *Brady* and erroneously considered the DNA evidence as part of its *Brady* analysis. He also challenges the chain of custody of the DNA evidence and the district court's interpretation of the DNA evidence. This court has jurisdiction to review the final judgment of the district court. 28 U.S.C. § 1291.

---

[1]We are cognizant of the Supreme Court's recent decision in *Cullen v. Pinholster*, —S. Ct.—, 2011 WL 1225705 (April 4, 2011), which held that habeas review under 28 U.S.C. § 2254(d)(1) "is limited to the record that was before the state court that adjudicated the claim on the merits." *Id*. at \*8. However, all of the evidence in the expanded record before the district court on remand—with the exception of the new DNA evidence which will be addressed *infra*—was considered by the state court in rejecting Apanovitch's *Brady* claim in his second petition for post-conviction relief. *See State v. Apanovitch*, 667 N.E.2d 1041 (Ohio Ct. App. 1995).

[2]Only 1 in 285 million Caucasians have DNA consistent with that left by Flynn's killer, and Apanovitch is one such Caucasian. The odds of the DNA being consistent with that of a particular non-Caucasian are in the billions.

II

As a threshold matter, although we previously ordered the district court to consider the newly discovered DNA evidence in the context of some of Apanovitch's claims, the district court erroneously considered the DNA evidence as part of its prejudice analysis under *Brady*.  Apanovitch is not now raising a *Brady* claim with regard to the DNA evidence itself.  The relevant inquiry under *Brady* is whether there is a reasonable probability that the result of the trial would have been different had the *Brady* evidence not been withheld. *Apanovitch,* 466 F.3d at 475 ("The failure to disclose such evidence is 'material,' and therefore 'prejudicial,' only 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" (quoting *Strickler v. Greene*, 527 U.S. 263, 280 (1999))).  The results of a DNA test performed two decades after the trial has concluded shed no light on the question of whether there is a probability that the jury in 1984 would have reached a different result had the *Brady* evidence not been withheld by the prosecution.  New, non-*Brady*, evidence is enlightening as to whether a petitioner is—seen as of now—actually innocent.  However, it is *not* enlightening as to the probability that a petitioner would have—at trial—been acquitted based on the evidence that was presented to the jury and on the evidence that was withheld from the defense, which is the *Brady* inquiry.  Notably, Apanovitch no longer argues that he is actually innocent.

The district court read this court's previous opinion to stand for the proposition that the DNA evidence should be used for *Brady* purposes.  Although that interpretation is incorrect, it is understandable in light of the following language from our earlier opinion:

> We suspect that the DNA evidence, should it be introduced and subjected to appropriate evidentiary challenges in court, might help resolve lingering questions of whether Apanovitch suffered actual prejudice when the state withheld the serological evidence, and whether Apanovitch's innocence claim can be verified.

*Apanovitch*, 466 F.3d at 489.  Standing alone, this language could be interpreted to be referring to the withheld serological evidence at issue in Apanovitch's *Brady* claim. However, the panel began its DNA-evidence discussion by explaining that one of Apanovitch's claims for relief was that the state violated his rights by failing to preserve the semen evidence for later DNA testing (until 1992, the state could not locate the evidence).  It is only in the context of Apanovitch's preservation-of-the-evidence claim that the panel suggested the DNA evidence could be used to determine whether Apanovitch had been prejudiced by the state's failure to produce the blood/semen slides until several years after the trial.  As is the case with his actual-innocence claims, Apanovitch does not bring that claim on appeal.  Because Apanovitch's only remaining claims are *Brady* claims, the new DNA evidence is not relevant here and we therefore do not reach the chain-of-custody and interpretation-of-the-DNA-evidence issues.

### III

Apanovitch argues that he was prejudiced by the prosecution's withholding of four pieces of evidence.  We disagree because, although the evidence introduced against Apanovitch at trial was not overwhelming, the exculpatory evidence at issue would have been of little or no value to him.  Although the state's conduct cannot be justified, the evidence that it withheld would have enabled Apanovitch to dispute only the very weakest of the prosecution's evidence and only slightly expand upon theories of innocence that, despite the state's conduct, he was still able to present to the jury. Accordingly, the state's wrongdoing, while deserving of scorn, does not "put the whole case in such a different light as to undermine confidence in the verdict." *Bell v. Bell*, 512 F.3d 223, 237 (6th Cir. 2008) (en banc) (quoting *Kyles v. Whitley*, 514 U.S. 419, 435 (1995)).

### A

First, the prosecution withheld from Apanovitch a police report concerning statements that Apanovitch made to a detective during the investigation of Flynn's murder.  At trial, Detective Anthony Zalar testified that Apanovitch had called him during the investigation and had "asked me when he's indic[]ted would I please contact

him first rather than just go arrest him." Appellant's App'x at 47. Zalar further testified that he had been "stunned" by Apanovitch's request. *Id*. at 48. When Apanovitch asked to see Zalar's written report, the prosecution explained that the statement at issue was not in the report. That, as it turned out, was untrue. Eight years later, when the City of Cleveland, by order of the Ohio Supreme Court, released documents to Apanovitch, one of the included documents was the written record of Apanovitch's phone call that the prosecution had earlier claimed did not exist. In relevant part, the report stated: "While typing this report, received a phone call from Anthony Apanovitch. He again stated that he was not responsible for this crime. He did request that *if* he was arrested or indicted in connection with this crime, that he be contacted first . . . ." *Id*. at 33 (emphasis supplied).

Apanovitch argues that, had the police report not been withheld, the jury would have heard the correct "if" statement, rather than the "when" statement. The latter statement, in Apanovitch's current view, constitutes an implicit confession. To be sure, the phrase "when I am indicted" reflects that Apanovitch thought he was going to be indicted. However, at the time he made the call, Apanovitch knew he was being investigated for the crime. In that context, the statement is not indicative of Apanovitch's sense of guilt, but rather his belief that the police thought he was guilty, which was a distinct possibility, as he was being seriously investigated. Even the erroneous statement, then, is far more indicative of, if anything at all, an overzealous prosecutor than Apanovitch's guilt. Further, Apanovitch's actual statement—"if I am indicted"—still indicates that Apanovitch thought it very likely that he would be indicted, and, viewed in its proper context, the actual statement therefore differs very little in meaning and evidentiary value from the statement presented to the jury.

Significantly, the prosecution did not treat the "when" statement as an implicit confession. As presented at trial, the value of the statement was not that Apanovitch implicitly confessed, but that Apanovitch's behavior during the investigation was highly unusual, and any distinction between "when" and "if" hardly impacts that point. Both prosecutors, Downs and Hudson, gave closing statements. Downs spoke first and did

not mention the statement at all. Hudson did mention the statement, but only barely. Hudson's closing argument consumes twenty-five pages of transcript, but the reference to the statement is but a few lines. Significantly, although Hudson referred to Apanovitch's call to the detective as "extremely important," he said nothing to suggest that the word "when" had any probative value. Rather, Hudson paid attention to the other statement Apanovitch made during that same phone call, that he had been in every room of the house and that, therefore, if detectives found his fingerprints, it did not mean anything. Notably, it was this aspect of the call, and not the "when" statement, that the Ohio Supreme Court considered as evidence of Apanovitch's guilt on direct review, even though "when" was uncontested at the time. *State v. Apanovitch*, 514 N.E.2d at 399.

Although Hudson did refer to Detective Zalar's statement at trial that he was "stunned" by Apanovitch's call, that part of the testimony does not change the analysis. First, although the "if" statement may be less stunning, there is no reason to believe that Zalar, if impeached with the report, would have recanted his statement that he was stunned because "if" does not change the bizarre nature of the call. Second, defense counsel cross-examined Zalar at length, focusing on the issue of why, if Zalar found the statement so stunning, he did not bother to write it down in his report or mention it to anyone until months later. Zalar did not offer a coherent explanation, and the use of the alternative wording would have made this cross-examination no more damaging to the government.

B

Second, the prosecution withheld from Apanovitch two written reports regarding the precise location of a hair that was found on the victim's body after the murder. At trial, Barbara Campbell, a trace-evidence technician, testified that the hair—which matched neither the victim nor Apanovitch—was found "on the back portion of [Flynn's] hand, which would have been the upper surface." Appellant's App'x at 38. A photograph of the hair's location was also presented as evidence at the trial. The photograph shows the hair on the palm of Flynn's hand, which is bound behind her back and positioned with the palm facing away from her body. In 1992, Apanovitch received

a report prepared by Campbell that stated the hair was located "on [the] victim's back under her bound hands," as well as a report prepared by the police stating that Campbell had reported that the hair was "behind the victims [sic] tied hands." *Id*. at 24, 28. Apanovitch argues that this withheld evidence indicates that the hair was *in between* Flynn's hands and her back, which, in Apanovitch's view, means that it could have only been left by Flynn's true killer and not, as the prosecution argued at trial, accidentally deposited by investigators.

The value to Apanovitch of the withheld evidence would have been minimal at best. The theory that the hair belonged to the true killer was already argued by Apanovitch's counsel at trial. Accordingly, the withheld evidence "would not have permitted the development of alternate theories or different lines of argument." *Brooks v. Tennessee*, 626 F.3d 878, 894 (6th Cir. 2010) (quoting *Bell*, 512 F.3d at 237). To be sure, the true-killer argument would have been more compelling had Apanovitch been able to better rebut the prosecution's explanation for the hair, and he may have been able to do so if the location of the hair was, in fact, in between the victim's bound hands and her back. But neither piece of withheld evidence clearly supports Apanovitch's view, and to the extent that either is inconsistent with Campbell's testimony, its value to Apanovitch would have been extremely minimal in light of Campbell's testimony at trial and the photograph that fully corroborated her testimony. Further, because of the positioning of the body, it is difficult to briefly describe the location of the hair without creating an ambiguity. On the other hand, it is easy to describe in only a few words the location that Apanovitch argues the withheld records indicate: "in between the back and the hands," for example. Campbell testified at trial that the hair was "on the back portion of the hand, which would have been the upper surface." She also described the hair's location as "the area of her hand." Clearly, Campbell had difficulty describing the location of the hair with any measure of precision, and, significantly, it was Campbell who prepared the lab report that Apanovitch now relies upon. In this context, the photographic evidence truly is worth a thousand words, and it is hard to imagine Apanovitch's "in between" argument, which is refuted by both Campbell's testimony and the photograph, carrying any weight at all with a jury.

C

Finally, the prosecution withheld from Apanovitch evidence that Flynn was a secretor of blood type A. At trial, Campbell testified that, although no physical evidence linked Apanovitch to the crime, both Apanovitch and the killer secrete blood type A. According to Campbell's testimony, because approximately 80% of people secrete their blood type and approximately 40% of people are blood type A, this blood evidence was consistent with the killer being any of approximately 340,000 men in the Cleveland area, enough to fill up Cleveland Stadium six times. Although, as this court stated in its previous opinion, this evidence is so "extraordinarily weak" that it "is virtually no evidence at all," *Apanovitch*, 466 F.3d at 481–82, the actual evidence, as Apanovitch later discovered, was weaker still. As it turns out, Flynn was also a type A secretor, and this fact was withheld from Apanovitch at trial. Because Flynn could have secreted the type A blood, we cannot be certain that it was secreted by the killer. Therefore, the blood evidence was inaccurately presented to the jury.

Even so, although the prosecution referred to the evidence multiple times, it did not do so in a way that prejudiced Apanovitch. Downs mentioned the blood evidence only once during his closing statement. He stated that, when investigators commenced their investigation, the only physical evidence they had was that one in three men could have left the blood evidence and that a hair on the back of the victim's hand could not be identified. Downs then explained how investigators identified Apanovitch as the killer: they found a check in the victim's house made out to him, they heard her friends' statements that she was afraid of him, they discovered that he had a scratch on his face from the night of the murder that he could not explain, and they discovered that he lied about his alibi. By design, the blood evidence did very little work in Downs's argument. It only showed a reason that Apanovitch could not be excluded at the very beginning of the investigation. Hudson also mentioned the blood evidence once during his closing statement. Like Downs, Hudson mentioned that the blood evidence narrowed down the pool of potential killers to one out of every three people. Hudson also referred to the earlier testimony that you could put all the matching suspects in Cleveland Stadium, but

then proceeded to argue that the murder was not something performed in front of a crowd, but was rather a "very private thing." From there, Hudson laid out all of the circumstantial evidence of Apanovitch's guilt. Although Hudson mentioned the blood evidence, he did not at all rely upon it in explaining to the jury that Apanovitch is the murderer.[3] Both prosecutors, then, mentioned the blood evidence but actually argued in favor of Apanovitch's guilt with all of the *other* evidence in the case and asked the jury to determine that Apanovitch was the killer based on *that* evidence, not that he was a type-A secretor.

In addition, the withheld evidence does not make the blood evidence disappear entirely, but only weakens it to a degree. The jury was incorrectly led to believe that, because the killer must have been a type A secretor, one in three men could have committed the crime, for a total of 340,000 possible suspects in the Cleveland area. In reality, the blood evidence indicates that the killer could have been either a type A secretor or a non-secretor.[4] Using the numbers presented at trial, over 50% of men could have committed the crime, for a total of over 500,000 possible suspects in the Cleveland area, enough to fill Cleveland Stadium nine times, not six. In light of the way the evidence was presented at trial and employed by the prosecution, the difference between one third and one half of all men is insignificant: neither is probative of Apanovitch's guilt. Accordingly, the withheld evidence would only have rendered the worthless blood evidence 50% more worthless and did Apanovitch little harm at trial.

---

[3]Hudson delivered the state's closing statement during the mitigation phase of the trial. At that time, he again addressed the blood evidence, but, as before, he focused on the other evidence to narrow down the possible suspects to Apanovitch. At one point, Hudson did say that if Apanovitch had been a type-B secretor, "he wouldn't be in this courtroom," suggesting that the blood evidence played a role. But this was immediately after repeating the reference to the stadium and explaining how the other circumstantial evidence worked to narrow the suspects down to Apanovitch.

[4]In his brief, Apanovitch argued that, because Flynn was a type A secretor, we do not know anything about the killer. At oral argument, he conceded that we can still rule out that the killer is a secretor of another blood type.

D

The proper *Brady* inquiry is whether the cumulative effect of the withheld evidence leads us to conclude that there is a reasonable probability that the result of the trial would have been different. *Doan v. Carter*, 548 F.3d 449, 460 (6th Cir. 2008). Although the withheld evidence was exculpatory, the evidence presented at trial was sufficient to support Apanovitch's conviction, and the withheld evidence does not undermine the best of it, but only the very worst of it. The blood evidence had almost no value and the value of Apanovitch's phone call to the police was not that he used the word "when," but that his request was unusual and, far more significantly, that he suggested that the police would find his fingerprints inside the house, which was but one example of his bizarre, suspicious behavior throughout the investigation. The withheld evidence does nothing to undermine the most crucial of the evidence against Apanovitch, such as the testimony that the victim feared him and that he was sexually interested in the victim, his lack of a consistent explanation for a scratch on his face, his false and changing alibi, and the fact that the victim was attacked with the very windowsill that he had spoken to her about painting. Although the mystery hair is arguably exculpatory evidence, Apanovitch relied on the hair to make that argument at trial, and the related withheld evidence strengthens that argument only minimally at best. Accordingly, viewed as a whole, the withheld evidence does not undermine our confidence in the outcome of Apanovitch's trial. We do not, however, suggest that the state's conduct was proper. Indeed, the state's conduct was unquestionably improper and, in the context of a capital trial, egregiously so. But the culpability of the state's conduct is not the test under *Brady*. Rather, Apanovitch must have been prejudiced by the state's conduct and, although it is a judgment call, we hold that he was not.

IV

For the foregoing reasons, we AFFIRM the judgment of the district court dismissing Apanovitch's petition for a writ of habeas corpus.