DECISION AND JOURNAL ENTRY
This cause was heard upon the record in the trial court. Each error assigned has been reviewed and the following disposition is made:
Thomas Gondek appeals his conviction after a jury trial in the Medina County Court of Common Pleas on charges of felonious assault, rape, and child endangering. We affirm.
 I.
In December 1997, Gondek moved in with his girlfriend Jennifer Claycomb in Brunswick, Ohio. Gondek and Jennifer lived with Jennifer's young daughters, Crystal and Autumn, ages three years and eighteen months. Jennifer had recently divorced her husband, Jason Claycomb, and she had custody of their daughters. Jennifer worked during the day and employed a babysitter for the girls. In January 1998, Gondek became unemployed, and the couple decided that Gondek should babysit the girls. At approximately 6 p.m. on March 17, 1998, while she was in the sole care of Gondek, Autumn became listless, turned blue, and stopped breathing. Gondek called 911. Brunswick paramedics transported Autumn to a local hospital and from there she was sent by life-flight to Metro General Medical Center for an emergency craniotomy to relieve excessive pressure in her brain. Despite six weeks of care, Autumn nearly died, and ultimately suffered extensive brain damage from the brain injury.
Based on the expert opinions of the pediatric specialists who cared for Autumn, it was apparent that Autumn was the victim of Shaken Baby Syndrome.[1] There was evidence that she had been raped anally as well. Gondek was immediately considered a prime suspect.
The following account of the time prior to the emergence of Autumn's symptoms is based on testimony of eyewitnesses, and Gondek's own statements to police.
Crystal and Autumn spent the weekend of March 13-15, 1998 with their father Jason for their regular visitation. On Sunday, March 15, at approximately 6:00 p.m., Jason returned the girls home to Jennifer. Autumn had some diarrhea, which her father attributed to the fact that she was teething. She may have also had a cold. Other than that, she was normal and healthy. On Monday, March 16, Jennifer went to a job interview, and Gondek babysat for the girls. During the afternoon, two of Gondek's friends, Dave Moorman and Kevin Foy, visited, but they had no interaction with the girls.[2] Later that evening, Brian Kissinger also visited, and stayed until around midnight. Both Jennifer and Gondek were home with the girls at the time.
On Tuesday, March 17, Jennifer woke the girls and fed them breakfast. At 9:15 a.m., she went to a new job that she had secured the day before. Jennifer said goodbye to the girls, who were both fine. Gondek again babysat for the girls. His friend Foy again visited with him from approximately 11:00 a.m. to 3:00 p.m. The girls were watching television, and Foy later testified that they both seemed normal. After Foy left at approximately 2:30 or 3:00 p.m., Gondek was alone with the two girls.
The following account of the next several hours is based on statements Gondek made later to the police, as Gondek was the only adult witness to these events. At approximately 5:15 p.m., Gondek heard a noise and came into the room where the girls were playing. He noticed that Autumn had a minor cut on her inner lip. He tried to dab the blood with a tissue. Autumn did not appear to be seriously harmed, and after Gondek tended to the cut, the girls resumed their playing. Gondek went into a bedroom to clean out a closet, and at about 6:30 p.m. he came into the living room and noticed that Autumn was on the floor lying on her back. She was unresponsive. Gondek tried to rouse her by gently shaking her, and when this effort failed, he tried to revive her using CPR. She began to breathe more deeply but was still unresponsive and listless. At approximately 6:45 p.m., Gondek called 911 for the Brunswick emergency medical services.
At 6:51, an off-duty Brunswick paramedic and an off-duty firefighter responded to the scene, and within minutes the EMS crew responded. By this time Autumn was not breathing, and she was blue and listless. Her eyes were fully dilated, indicating that she had suffered a head injury. The paramedics administered oxygen and then transported Autumn to Southwest General Hospital, where a CT scan was performed, which showed that Autumn was suffering from a subdural hematoma. Autumn was then sent by life-flight to Metro General Hospital.
At Metro, Autumn underwent an emergency craniotomy to remove the subdural hematoma from the left side of her brain and to relieve the pressure that had already begun to threaten the right side of the brain as well. The day after she was admitted to Metro, doctors performed an ophthalmologic examination on Autumn, and the exam revealed that Autumn had suffered retinal hemorrhaging. The presence of retinal damage and the subdural hematoma led the doctors to conclude that Autumn had been the victim of Shaken Baby Syndrome.
During their examination of Autumn, the doctors at Metro also noted signs that she had been anally raped. They performed a full examination of Autumn, and sent a rape kit with a rectal swab sample to the Ohio Bureau of Criminal Identification and Investigation (BCI) for analysis. BCI found sperm in the sample.
The Brunswick police conducted an investigation of the apparent abuse. The investigation included statements voluntarily made by Gondek both to the EMS personnel and to the police after he was advised of his Miranda rights. Gondek freely acknowledged that he had been the only adult left alone with Autumn during the day of March 17. However, some of his statements conflicted with statements he had made to the responding EMS personnel about the location and time of his discovery of Autumn. Gondek and Jennifer both reported that Autumn had fallen down a carpeted flight of stairs (up to seven steps) at Gondek's parents' house on approximately March 10. However, Jennifer testified that she had examined Autumn at the time and she seemed fine. There had been no change in her behavior in the intervening week to indicate that the earlier fall might be linked to her head injury.
On May 6, 1998, the Medina County Grand Jury indicted Gondek for felonious assault, a second degree felony in violation of R.C.2903.11; rape of a child younger than thirteen years old, a first degree felony in violation of R.C. 2907.02(A)(1)(b) and2907.02(B); and child endangering, a third degree felony in violation of R.C. 2919.22(B)(1) and 2919.22(E)(1)(c). A jury trial commenced on August 31. After the jury was impanelled but before opening statements, the State moved to amend the second count of the indictment, which erroneously listed the mental state for felonious assault as "recklessly" rather than "knowingly." Gondek objected, but the trial court permitted the amendment. The court advised Gondek that he could ask for a continuance, but he declined to do so, saying a continuance "wouldn't do any good[.]"
The State presented twenty witnesses, including Autumn's parents and Gondek's friends who all testified that Autumn was fine when they saw her on the days and hours just prior to the emergence of her post-trauma symptoms. Dr. Durgham and Dr. Ashmead, who examined and treated Autumn at Metro General, testified that in their professional opinion Autumn had been the victim of Shaken Baby Syndrome, because the combination of a subdural hematoma and the retinal hemorrhaging is decisively characteristic of the syndrome. They testified that the injury to Autumn was caused by sudden acceleration and deceleration, with or without impact. They testified that the two causes of such injuries in a young child are Shaken Baby Syndrome and a motor vehicle accident. Durgham testified that the shaking which caused Autumn's injury was so severe and violent that the person who injured Autumn would have to know that severe physical harm would result. Dr. Anderson, who performed the craniotomy, testified that the injury was not the result of Shaken Baby Syndrome. However, he testified that he did not do the requisite ophthalmologic exam to rule out the syndrome, and that his concern is never the cause of the injury, but the prognosis for recovery.
All these treating physicians concluded that, whatever its nature, the trauma to Autumn happened shortly before she became listless and unresponsive. They testified that Autumn could not have walked around after the trauma that caused the subdural hematoma. Durgham and Ashmead testified that tests revealed that Autumn had a small skull fracture, which was older than the subdural hematoma. Durgham testified that whatever caused the skull fracture was a minor injury and would not have caused the subdural hematoma. Anderson and Durgham also testified that the fall down the steps a week earlier would not have produced a subdural hematoma, but rather an epidural hematoma. Anderson, who extracted the blood clot which caused the hematoma, and Ashmead, the neuropathologist who analyzed it to determine its age, both testified that it was less than twenty-four hours old, and more likely between four and six hours old when it was removed at 10 p.m. on March 17, just over three hours after Gondek's 911 call.
Dr. Durgham and Dr. Feingold, who also examined and treated Autumn at Metro General, testified to the evidence of anal rape, which included bruising on the left and right sides of her torso, bruising around the rectum, very wide gaping of the rectum, and lacerations in the rectum. Feingold, an expert in child sexual abuse, testified that the State's evidentiary photographs, which showed the bruising around the rectum, did not do justice to the deep color of the blue area which he saw during his March 18 examination, and which he believed clearly evidenced bruising. Defense counsel asked Feingold whether the barbiturates administered to Autumn would cause the wide gaping of the rectum, due to relaxation of the muscles. Feingold testified that even when children are under heavy sedation such a wide gaping is often not present. He believed that only sexual penetration could account for such a condition.
Three experts from the BCI testified that two spermatozoa heads had been found in the rectal swab sent to them for examination. Dale Laux and Cindy Shannon of BCI testified that due to the hostile environment in the anus, especially that of a child suffering from diarrhea, any residue of sperm would have decomposed within twelve to twenty-four hours after it was deposited there. Since the rectal sample was obtained on March 18, at approximately 1:00 p.m., and the sample became stabilized in the rape test kit, the rape would have to have occurred no earlier than 1:00 p.m. on March 17. An independent laboratory which tested for DNA concluded that the non-sperm material in the sample was consistent with Autumn's DNA and was not consistent with Gondek's DNA. It also concluded that there was insufficient DNA material from the sperm to include or exclude Gondek as the donor.
Also in evidence were Gondek's written statements made to the police. Gondek stated that he found Autumn on the floor near a table in the living room, which led him to believe that Autumn may have fallen from the couch and hit the table while he was in another room. Gondek stated that the various friends who had been in the house on March 16 and 17 had not been left alone with Autumn. The only exception was Dave Moorman, who was allowed to use the restroom for a few minutes at approximately 4:30 p.m. on March 16, while Autumn and Crystal were in the bathtub, behind the shower curtain. Gondek acknowledged that from 9:15 a.m. on March 17, he was the only adult who was alone with Autumn.
At the close of the State's case, Gondek moved for an acquittal, pursuant to Crim.R. 29, on the basis that the State had not even proved that a crime had been committed, let alone that Gondek was the perpetrator. The court overruled the motion.
The defense presented as its sole witness Dr. Guertin, a medical expert with extensive experience in diagnosing and treating child sexual abuse. His testimony was based on most, but not all, of the medical records in the case, including the photographs of the bruises on Autumn's torso and around the rectum. Guertin concluded that Autumn had not been raped, based on the photographs which he believed showed light discoloration of the peri-rectal area, no evidence of lacerations, and a small rectal distention. Furthermore, Guertin testified that when a child is under heavy sedation, as Autumn was after her admission to Metro, the muscles in the rectum relax and therefore gape larger than normal. However, Guertin admitted did not know that the BCI had found sperm head in the rectal swab. When asked if that information would affect his opinion that no rape had occurred, he admitted that "it could." He also acknowledged that the most important component in a child sexual abuse examination is the physical examination of the child and that he did not perform such an examination of Autumn.
At the conclusion of the defense case, Gondek renewed his Crim.R. 29 motion, which the court again denied. The case was submitted to the jury, which, after eight hours of deliberation, rendered guilty verdicts on all charges. Subsequently, the trial court sentenced Gondek to consecutive sentences of life imprisonment on the rape charge, eight years imprisonment on the felonious assault charge, and five years on the child endangering charge. Gondek timely filed the instant appeal, assigning three errors.
II. ASSIGNMENT OF ERROR I.
 THE TRIAL COURT ERRED ALLOWING THE STATE OF OHIO TO AMEND COUNT II OF THE INDICTMENT FROM A SIMPLE ASSAULT TO A FELONIOUS ASSAULT.
After the jury had been impanelled, the State moved for permission to amend the felonious assault count of the indictment because the indictment incorrectly stated the culpable mental state as "recklessly" rather than "knowingly." The State argued that the error was merely a typographical error, and that the count was clearly labeled "Felonious Assault * * * F-2" and cited to R.C. 2903.11. Gondek objected to the amendment, on the basis that the change in culpable mental state essentially changed the crime charged from simple assault, a first degree misdemeanor, in violation of R.C. 2903.13, to felonious assault. The trial court permitted the amendment over Gondek's objection. The court then asked defense counsel if he wished to move for a continuance. Counsel declined the offer, stating that a "continuance * * * wouldn't do any good[.]"
Crim.R. 7(D) governs the amendment of an indictment. The Rule states:
 The court may at any time before, during, or after a trial amend the indictment, information, complaint, or bill of particulars, in respect to any defect, imperfection, or omission in form or substance, or of any variance with the evidence, provided no change is made in the name or identity of the crime charged. If any amendment is made to the substance of the indictment, information, or complaint, or to cure a variance between the indictment, information or complaint and the proof, the defendant is entitled to a discharge of the jury on the defendant's motion, if a jury has been impanelled, and to a reasonable continuance, unless it clearly appears from the whole proceedings that the defendant has not been misled or prejudiced by the defect or variance in respect to which the amendment is made, or that the defendant's rights will be fully protected[.]
Gondek contends that the change in the culpable mental state from the erroneous "recklessly" to the correct "knowingly" changes the identity of the crime charged from assault to felonious assault. Gondek further argues that because the amendment changed the identity of the crime charged, the amendment was prohibited under Crim.R. 7(D), even without a showing of prejudice. Thus, he argues, the amendment "made the potential penalty much worse, and totally changed the statute under which the grand jury charged the defendant." We disagree.
Felonious assault is prohibited by R.C. 2903.11(A) which states, "No person shall knowingly * * * [c]ause serious physical harm to another[.]" Assault is proscribed by R.C. 2903.13(B) which states: "No person shall recklessly cause serious physical harm to another[.]" The indictment included the caption "FELONIOUS ASSAULT [R.C.] 2903.11 (F-2)[.]" The body of the indictment dealing with the second count charged Gondek with "recklessly caus[ing] serious physical harm to Autumn, in violation of 2903.11 of the Ohio Revised Code (F-2)[.]" We find that the inclusion of "recklessly" in an indictment which clearly charged the defendant with felonious assault was in the nature of an "internal inconsistency" which was appropriately amended.State v. Earle (1997), 120 Ohio App.3d 457, 467. The grand jury indicted Gondek for felonious assault. The amendment merely stated the correct culpable mental state for the crime charged.
When, as here, an amendment is made to the substance of the indictment, "the defendant is entitled to a discharge of the jury on the defendant's motion, * * * and to a reasonable continuance, unless it clearly appears from the whole proceedings that the defendant has not been misled or prejudiced by the defect or variance[.]" Crim.R. 7(D). Gondek did not move for a discharge of the jury, which had already been impanelled. The trial court asked defense counsel if he wished to move for a continuance, but he declined to do so. Consequently, Gondek has waived any objection on this basis. Furthermore, it is clear from the record that Gondek was not misled or prejudiced by the incorrectly cited culpable mental state. Gondek was well aware that he was being charged with felonious assault. The defense strategy consisted of maintaining that Gondek essentially did not touch Autumn. The defense attempted to establish reasonable doubt by referencing other possible traumas that may have caused Autumn's head injury, such as the fall which occurred the week earlier. The change from a culpable mental state of reckless to one of knowing would not have altered that strategy.
We find that the amendment was appropriate to correct an internal inconsistency in the indictment and that Gondek suffered no prejudice from the inclusion of the incorrect culpable mental state in the indictment. Therefore, we overrule Gondek's first assignment of error.
III. ASSIGNMENT OF ERROR II.
 THE TRIAL COURT ERRED OVERRULING DEFENDANT-APPELLANT'S CRIMINAL RULE 29 MOTIONS FOR A JUDGMENT OF ACQUITTAL MADE AT THE END OF THE STATE'S CASE IN CHIEF AND RENEWED AT THE END OF THE PRESENTATION OF ALL THE EVIDENCE BECAUSE THE STATE FAILED TO SUBMIT ANY EVIDENCE LINKING DEFENDANT-APPELLANT GONDEK TO THE CRIME ALLEGED PERPETRATOR [sic].
ASSIGNMENT OF ERROR III:
 THE VERDICT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
Crim. R. 29(A) requires the court to enter a judgment of acquittal if the evidence is insufficient to sustain a conviction of the offenses alleged in the indictment. "Pursuant to Crim.R. 29(A), a court shall not order an entry of judgment of acquittal where the evidence is such that reasonable minds can reach different conclusions as to whether each material element of a crime has been proved beyond a reasonable doubt." State v.Apanovitch (1987), 33 Ohio St.3d 19, 23, quoting State v.Bridgeman (1978), 55 Ohio St.2d 261, syllabus. Thus, the review of a Crim.R. 29(A) motion is a review of the sufficiency of the evidence. A reviewing court, when considering the trial court's ruling on a Crim.R. 29(A) motion for judgment of acquittal, construes the evidence in a light most favorable to the State.State v. Wolfe (1988), 51 Ohio App.3d 215, 217.
Gondek also asserts that the verdict was against the manifest weight of the evidence. This Court has written that "[b]ecausesufficiency is required to take a case to the jury, a finding that a conviction is supported by the weight of the evidence must necessarily include a finding of sufficiency." (Emphasis sic.)State v. Roberts (Sept. 17, 1997), Lorain App. No. 96CA006462, unreported, at 4.
 When an appellate court reviews the weight of the evidence [t]he court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of the witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.
State v. Martin (1983), 20 Ohio App.3d 172, 175. "Only in the exceptional case, where the evidence presented weighs heavily in favor of the defendant, will the appellate court reverse and order a new trial." State v. Ali (Apr. 28, 1999), Summit App. No. 19119, unreported, at 9. For the following reasons, we believe that the verdict was supported by the weight of the evidence, and therefore also was sufficient for the case to go to the jury.
To obtain a conviction on the felonious assault charge, the State was required to prove beyond a reasonable doubt that Gondek (1) knowingly (that is, "when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature[,]" [R.C. 2901.22(B)]) (2) caused serious physical harm (3) to Autumn. R.C. 2903.11(A)(1). To prevail on the child endangering charge, the State had to prove beyond a reasonable doubt that Gondek (1) recklessly (that is, "with heedless indifference to the consequences, * * * perversely disregard[ing] a known risk[,]" [R.C. 2901.22(C)]) (2) abused (3) Autumn (4) who was less than eighteen years old and (5) the abuse resulted in severe physical harm. R.C. 2919.22(B)(1) and 2919.22(E)(1)(c). See, also, State v. Adams (1980), 62 Ohio St.2d 151, paragraph one of the syllabus.
The expert medical testimony established that the trauma that caused Autumn's head injury had to have occurred no sooner than twelve hours to twenty-four hours prior to the removal of the blood clot at 10 p.m. on March 17. The medical experts testified that the trauma most likely occurred between four and six hours prior to that time. The primary causes of the subdural hematoma are Shaken Baby Syndrome and motor vehicle accidents. By Gondek's own voluntary statements to the police, he was the only adult alone with Autumn from the time Jennifer left for work at 9:15 a.m. on March 17, and Autumn remained in the apartment that day, until she was transported to the hospital. One doctor testified that whoever shook Autumn shook her so violently that the perpetrator had to know that serious physical harm would result. The testimony also established that Autumn suffered severe brain injury from the shaking.
The defense tried to establish reasonable doubt by suggesting that a fall one week earlier may have caused the head injury, that Autumn's father may have injured her on the weekend, over forty-eight hours prior to the 911 call, or that the injury may have been caused by an unsubstantiated fall from a couch onto a table. However, the medical experts testified that if a head injury had resulted from Autumn's earlier fall down the steps at Gondek's parents' house, or from a fall from as high as a crib to the floor, that injury would be in the nature of a epidural hematoma, very different anatomically and with very different symptoms than those suffered by Autumn. The uncontroverted expert medical testimony also established that the injury was no older than twenty-four hours old as of 10 p.m. on March 17 and was very likely only four to six hours old. Gondek, by his own admission, was the only person in a position to cause the head injury within the requisite time frame. We find that the evidence was sufficient to give the case to the jury on the charges of felonious assault and child endangering and we cannot say that the jury lost its way in rendering guilty verdicts on these charges.
On the rape charge, the State had to prove beyond a reasonable doubt that Gondek (1) engaged in sexual conduct (2) with Autumn (3) who was less than thirteen years old. R.C.2907.02(A)(1)(b).
The DNA evidence was not sufficient to either include or exclude Gondek as the offender. However, the presence of sperm and the bruising and gaping of the rectum was clear evidence that this child was anally raped. The expert medical testimony established that the time frame for the occurrence of such an offense was within twelve to twenty four hours prior to the collection of the sample, which occurred at approximately 1:00 p.m. on March 18. Gondek acknowledged that he was the only adult male alone with Autumn during that time frame. Thus, he was the only person who had the opportunity to commit this crime. We find that the evidence as to the rape count was sufficient to present that count to the jury. We cannot say that the guilty verdict was against the manifest weight of the evidence, that the jury clearly lost its way, or that a manifest miscarriage of justice resulted.
Because the evidence on all three charges was sufficient to present the case to the jury, we find that the trial court appropriately overruled Gondek's Crim.R. 29 motions for acquittal. We overrule his second assignment of error.
Because the verdicts on all three charges were not against the manifest weight of the evidence, we overrule Gondek's third assignment of error.
Having overruled Appellant Gondek's assignments of error, we affirm the judgment of the trial court.
Judgment affirmed.
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Medina, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E).
Costs taxed to Appellant.
Exceptions.
WILLIAM R. BAIRD, FOR THE COURT
CARR, J., WHITMORE, J., CONCUR.
[1] This syndrome is also called "Shaken Impact Syndrome." It is the rapid acceleration and deceleration of the brain inside the skull that causes the brain injury or subdural hematoma. In a small child, this can result when the child is shaken very violently or when the child is thrown against a surface, either soft or hard. In the second scenario, it is not the impact with the surface that causes the brain injury, but the sudden deceleration of the brain on impact which is the problem. Thus, in a motor vehicle accident, when a person is restrained by a seat belt or an air bag, the impact itself would not necessarily be injurious, but the rapid deceleration would cause brain injury.
[2] There was some discrepancy between Gondek's written statement to the police and the testimony of Moorman and Foy as to the duration of their visits on March 16. Gondek stated that Moorman was there for approximately five hours, while Moorman testified that his visit lasted only a few minutes. Foy testified that he and Moorman stopped by briefly on March 16, and that he (Foy) left after half an hour. However, it is uncontested that on March 17, Foy was the only visitor to the apartment, and that he stayed for approximately three hours, from 11:00 a.m. to 3:00 p.m.