OPINION
After a jury trial, Darrell Crenshaw was convicted of aggravated robbery and was sentenced to six years in prison. Crenshaw now appeals, raising the following assignments of error:
 I. Appellant's conviction for aggravated robbery is based upon insufficient evidence.
 II. Appellant's conviction for aggravated robbery is against the manifest weight of the evidence.
 III. The trial court erred in overruling Appellant's motion for a new trial. Upon reviewing the evidence and applicable law, we find the assignments of error without merit. As a result, the judgment and conviction will be affirmed.
 I
The primary thrust of Crenshaw's appeal is that the State did not prove that he used a deadly weapon in committing a theft offense. In the first assignment of error, this argument is phrased in terms of "legal sufficiency." In the second assignment of error, Crenshaw's focus is on whether the conviction was against the manifest weight of the evidence. Nonetheless, both assignments of error raise essentially the factual issue and will be considered together.
The charges against Crenshaw arose from the events of January 25, 2000. At the time, Crenshaw was a heroin addict. On the day in question, Crenshaw went to a Sam's Club in Beavercreek, Ohio, to steal merchandise that could later be sold to support his habit. While Crenshaw was in the store, the business manager, Thomas Cooper, and an assistant manager, Tony Glass, were alerted about suspicious behavior. As a result, Glass and Cooper began to follow Crenshaw. At some point, Crenshaw went to the clothing department, removed his coat, and put on a leather coat belonging to the store. Crenshaw then put his own coat back on and left the store. Glass saw Crenshaw commit these acts.
Glass immediately followed Crenshaw outside, and Cooper was close behind. Glass said to Crenshaw, "Sir, can you stop for a second. I believe that there is something underneath your coat that you forgot to pay for." Glass also asked Crenshaw to come back into the Club.
Up to this point, there is little dispute about what happened. Crenshaw freely admitted at trial that he stole the leather coat and that he was confronted outside by store personnel. The witnesses all also agreed that when Crenshaw was confronted, he took off the leather coat and laid it on a flatbed cart that was sitting outside the store. However, the stories then diverged. Both Glass and Cooper testified that Crenshaw did not respond to the request to come back inside. Instead, he began to walk away. Crenshaw told Cooper and Glass that he did not want any trouble. He then pulled a knife from his pocket, opened the blade, showed it to Cooper and Glass, and then closed the knife back up.
At that time, Glass and Cooper backed off because they did not want to get into a conflict. Crenshaw then began running away from the Sam's Club parking lot, towards the Walmart and Fashion Bug stores. Cooper and Glass followed at a distance, trying to keep Crenshaw in sight so they could point out his location to the police. In the meantime, the store manager had called the police. Patrolman, Joseph Topiah, was at a nearby shopping center and was able to quickly respond. When Topiah pulled up in front of Fashion Bug, he saw a man being chased by two other males. Topiah then arrested Crenshaw after a brief struggle, during which both Crenshaw and Topiah fell into a snowbank. At the time of the fall, Topiah felt something drop from Crenshaw's pocket. One of the loss prevention people then recognized the knife and recovered it from the snow.
Topiah testified that Crenshaw said at the scene that he was a heroin addict and was stealing to support his habit. Crenshaw admitted to Topiah that he pulled out the knife. However, he contended that the blade was not open. Crenshaw claimed that he did not know that the men were from loss prevention, and thought they were trying to "jump" him.
In contrast, Crenshaw testified at trial that the knife fell out of his pocket when he tried to remove a Sam's card from the same pocket. In this regard, Crenshaw testified that when he was confronted outside the store, he recognized that he had been caught. As a result, he took off the leather jacket and tried to hand it to Glass. Because Glass did not accept the jacket, Crenshaw placed it on a flatbed cart. At that time, Glass asked Crenshaw to step back into the store. According to Crenshaw, Glass had a look on his face like he wanted to physically do something to Crenshaw.
Glass then asked Crenshaw how he got into the store. At that point, Crenshaw reached into his pocket to take out the Sam's Club card. The knife was in the same pocket and was on a string. Because Crenshaw's pants were tight, his finger got caught on the string and the knife accidentally came out along with the card. Crenshaw denied opening the knife, and said he put the knife back into his pocket right away. Crenshaw explained that he carried the knife for use in cutting tags off merchandise.
Crenshaw did not want to go back in the store because he had done that before and had been beat up. He wanted to get away from store and the men. Further, he had friends in a car in the parking lot who would pick him up. As a result, Crenshaw began walking away from Glass and Cooper and then began running. When the police arrived, he was so tired from running that he did not resist the officer. Instead, his knife "flew out" of his pocket when the officer threw him to the ground. And finally, Crenshaw testified that his story at trial was the same as the account he had given the police when he was arrested.
As we said earlier, Crenshaw claims in the first assignment of error that his conviction was based on insufficient evidence. Specifically, Crenshaw contends that the State failed to prove that the knife was a "deadly weapon."
In assessing claims of legal sufficiency, we examine the evidence admitted at trial to decide "`whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" State v. Morrow (2000), 138 Ohio App.3d 38, 45 (citation omitted).
Crenshaw was indicated on a charge of aggravated robbery, in violation of R.C. 2911.01(A)(1). This statute provides, in pertinent part, that:
 [n]o person, in attempting or committing a theft offense, as defined in section 2913.01 of the Revised Code, or in fleeing immediately after the attempt or offense, shall do any of the following:
 (1) Have a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it.
Similarly, a deadly weapon is defined by statute as "any instrument, device, or thing capable of inflicting death, and designed or specially adapted for use as a weapon, or possessed, carried, or used as a weapon." R.C. 2923.11.
In arguing that the knife was not a deadly weapon, Crenshaw relies on case law which holds that knives are not presumed to be deadly weapons. Additionally, Crenshaw contends that criminal activity by a person carrying a knife is not enough to make a pocketed knife into a deadly weapon.
Crenshaw is correct when he says that knives are not generally presumed to be deadly weapons. See, e.g., City of Columbus v. Dawson (1986),28 Ohio App.3d 45 . Instead, the State must prove beyond a reasonable doubt, either: "1) that the knife was designed or specifically adapted for use as a weapon or 2) that the defendant possessed, carried, or used the knife as a weapon." State v. Cathel (1998), 127 Ohio App.3d 408, 412.
After viewing the evidence most favorably to the State, we think a rational fact finder could easily find the elements of the crime established. Specifically, two witnesses testified that while being pursued, Crenshaw took the knife from his pocket, opened it, and showed it to them, while saying, "I don't want any trouble." These facts certainly establish use of the knife as a weapon. We also note that Crenshaw admitted at trial that the knife was capable of inflicting death.
By way of contrast, the defendant in Cathel did not "brandish" his weapon. See, id. at 412. Instead, the defendant in that case was simply walking down a street when he was arrested on a charge of criminal mischief. A subsequent search revealed a closed pocketknife in his pocket. Under the circumstances, the Ninth District Court of Appeals found insufficient proof that the defendant "possessed, carried, or used" the knife as a weapon. Id.
On the other hand, the defendant in State v. Workman (1992),84 Ohio App.3d 534, brandished a knife after being chased and confronted by police officers. Id. at 536. Under these circumstances, the court found that reasonable minds could conclude that the defendant used the knife as a weapon. Id.
Obviously, these types of conclusions are fact-intensive and depend on the circumstances of the particular case. As we said, a rational fact-finder could conclude that Crenshaw used the knife as a weapon. Accordingly, the evidence was legally sufficient to sustain the conviction.
The second assignment of error is based on the claim that the conviction was against the manifest weight of the evidence. In this regard, Crenshaw's primary argument is that the testimony of the key State witnesses is not credible because they testified that Crenshaw opened the knife with his left hand and closed it within a couple of seconds. Additionally, neither witness heard a clicking noise when the knife opened. Appellate counsel indicates that he had to use two hands to open the knife and that when the knife is opened, a clicking noise is made.
In reviewing manifest weight challenges, a court does not simply consider the sufficiency of the evidence. It also decides if the evidence is believable. Further, the evidence is not construed in favor of the State. Instead, after reviewing the entire record, a court "`weighs the evidence and all reasonable inferences, considers the credibility of the witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" State v. Jones (1996), 114 Ohio App.3d 306, 324 (citations omitted).
After applying these standards, we find no basis for reversing the conviction. As a preliminary point, we note that appellate counsel's observations about and experiments with physical evidence (in this case, the knife) are not properly part of the record and will not be considered. See, e.g., State v. Ishmail (1978), 54 Ohio St.2d 402, paragraph one of the syllabus (indicating that a "reviewing court cannot add matter to the record before it, which was not a part of the trial court's proceedings, and then decide the appeal on the basis of the new matter").
Furthermore, we do not find Crenshaw's testimony more credible than the testimony of the witnesses who saw the open knife blade. These witnesses both said that they saw the open blade of the knife. Crenshaw has not suggested any reason why two eye-witnesses would be untruthful about such a matter. However, even if we assume this as a possibility, the fact is that Crenshaw told a different story at trial than he did on the day of the incident. As we noted above, Crenshaw told the police that he pulled the knife out of his pocket because he thought he was being "jumped." At trial, however, he claimed the knife came out accidentally.
Moreover, even if we believed Crenshaw's account at trial, his testimony is internally inconsistent. Specifically, Crenshaw explained at trial that the knife came out accidentally because his pants were tight and his finger got caught on a string which was attached to the knife. However, in later testimony, Crenshaw said the knife "flew out" of his pocket when the police officer threw him on the ground. This latter scenario is completely inconsistent with the claim that the pants were tight.
Accordingly, in light of the preceding discussion, the first and second assignments of error are overruled.
 II
In the third assignment of error, Crenshaw contends that the trial court erred in refusing to grant his motion for a new trial. Crenshaw did not make any specific arguments about this point on appeal, but simply incorporated the content of the motion for new trial which was filed in the trial court. This is not appropriate appellate procedure under App.R.16(A). Further, under App.R. 12(A)(2), we may disregard assignments of error that are not properly presented for review.
In the interest of justice, we will consider the assignment of error, since it was not apparently done to circumvent page limits on briefs. Compare Durgan v. Ohio Bur. of Emp. Serv. (1996), 110 Ohio App.3d 545,552 (rejecting incorporation by reference of trial document, since it was used to evade page limits for briefs). We also note that Crenshaw did attach a copy of the motion for new trial to his brief. Our decision to ignore the deficiency in this case should not be taken as an endorsement of such shortcuts. Appellate courts should not have to hunt through trial court materials to discern what a litigant's position is on appeal.
In any event, after reviewing the motion for new trial, we find that it is based on several items: 1) the matters alleged in the first two assignments of error; 2) alleged prosecutorial misconduct in questioning Crenshaw about the knife's capacity as a deadly weapon; 3) prosecutorial misconduct in closing argument; and 4) trial court error in instructing the jury. Accordingly, we will consider these matters in deciding whether the trial court correctly denied the motion for new trial.
Motions for new trial under Crim. R. 33(B) are "addressed to the sound discretion of the trial court, and will not be disturbed on appeal absent an abuse of discretion." State v. Schiebel (1990), 55 Ohio St.3d 71, paragraph one of the syllabus. In view of our resolution of the first two assignments of error, we believe the trial court correctly rejected a new trial in connection with Crenshaw's deadly weapon argument.
Second, we find no evidence of prosecutorial misconduct in questioning Crenshaw about the knife's capacity as a deadly weapon. During cross examination, the prosecutor asked Crenshaw whether the knife could cause fatal injuries. Defense counsel objected to this line of questioning, but the objection was overruled. We think this was a proper subject of inquiry. We also see no evidence of improper motive on the prosecutor's part.
According to Crenshaw, the prosecutor's questions were intended to mislead the jury about the definition of bodily harm, i.e., they were designed to make the jury believe that the only requirement for a deadly weapon was that a weapon be capable of causing death or serious physical harm. However, we disagree. After reviewing the record, we find that the questions properly related to a factual matter at issue and were not misleading. Since Crenshaw chose to testify, and did testify about the weapon on direct examination, the State was entitled to ask Crenshaw whether the knife was capable of inflicting death. The jury was also properly instructed on the elements for aggravated robbery, including the standards for deadly weapons. In other words, the jury knew that ability to inflict lethal harm was not the only characteristic of a deadly weapon.
Notably, whether knives are capable of inflicting deadly harm is probably not a matter of strong dispute. Instead, the significant issue in these cases is whether the knife was designed for use as a weapon or was being possessed or used as a weapon at the time of the crime. For example, in Cathel, the court noted that "[t]here is no dispute that the knife in question is capable of inflicting death."127 Ohio St.3d at 411. Likewise, in State v. Patterson (Mar. 14, 1994), Stark App. No. 9435, unreported, the court conceded that a produce knife is capable of inflicting death, but also noted that the state had the burden of proving an additional element in the statute, i.e., that the knife was designed as a weapon or was possessed, carried, or used as a weapon. Id. at p. 2. By the same token, we cannot fault the State for not assuming this point, since the State had the burden to prove all necessary statutory elements.
The second ground of prosecutorial misconduct involves alleged improper closing argument. In this regard, Crenshaw focuses on three items: 1) the prosecutor's repeated reference to the fact that Crenshaw was making up a story; 2) repeated incorrect references to Crenshaw's past criminal record; and 3) comments that defense counsel was presenting a "smoke screen."
The Ohio Supreme Court has said that prosecutorial misconduct "during trial cannot be made a ground of error unless the conduct deprives defendant of a fair trial." State v. Keenan (1993), 66 Ohio St.3d 402,405. However, failure to raise objections to misconduct at trial waives all but plain error. See, State v. Jones (2001), 91 Ohio St.3d 335, 352.
Our review of the record reveals that no objections were made during closing argument. Accordingly, Crenshaw has waived all but plain error. In this particular context, we have previously stressed that [w]e recognize plain error "`with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice.'" * * * In order to prevail on a claim governed by the plain error standard, * * * [the defendant] must demonstrate that the outcome of her trial would clearly have been different but for the errors that she alleges. * * * Thus, the alleged prosecutorial misconduct constitutes plain error only if it is clear that * * * [the defendant] would not have been convicted in the absence of the improper comments. * * * The plain error standard generally presents, in accordance with its design, an almost insurmountable obstacle to reversal in cases such as this. State v. Carpenter (1996), 116 Ohio App.3d 615, 621 (citations omitted).
Based on the record before us, we see no plain error that would justify setting the verdict aside. At one point during closing, the prosecutor did say that Crenshaw had "lied" about having the knife for the purpose of cutting tags from clothing when he shoplifted. The prosecutor appears to have believed Crenshaw lied about this point because the stolen coat still had tags.
The Ohio Supreme Court has said that attorneys may not properly express their personal beliefs about the credibility of witnesses or the guilt of an accused. See, e.g., State v. Apanovitch (1987), 33 Ohio St.3d 19, 24. However, as the Court stressed in Apanovitch, considerable latitude is allowed in closing argument. Id. Under the circumstances, we do not feel that the outcome of the trial would clearly have been different but for the prosecutor's comments. As we said before, ample evidence existed to support the jury's verdict.
Concerning the second item, we did not find any improper mention of Crenshaw's prior criminal record during the closing argument. Consequently, no plain error can exist concerning this issue.
The final item in this regard was the prosecutor's comment in closing argument about defense counsel throwing out a "smoke screen." Such remarks have been held improper, as they intimate that defense counsel "`suborned perjury by manufacturing, conceiving and fashioning lies.'" State v. Braxton (1995) 102 Ohio App.3d 28, 42. In Braxton, the court refused to grant a new trial on this basis, because the comment was isolated.
We agree that such comments are inappropriate. However, the prosecutor's remark was an isolated one. Again, since ample evidence existed to support the verdict, the outcome of the trial would not clearly have been different absent the comment.
Crenshaw's last argument in support of a new trial involves the trial court's rejection of a proposed interrogatory. At trial, defense counsel orally asked the court to give an interrogatory requiring the jury to decide if the knife was open. The court refused the request and instead instructed the jury on the elements of aggravated robbery and the definition of "deadly weapon." In the motion for new trial, Crenshaw argued that the failure to give the interrogatory made it impossible to tell if the jury convicted him merely on the basis of possessing a pocket knife.
Civ.R. 49(B) requires trial courts to give interrogatories to the jury upon request. However, the Ohio Criminal Rules do not have a similar provision. Compare Crim. R. 30. Therefore, the trial court had no duty to give the jury the requested interrogatory. Even where the trial court has a duty in civil cases, its actions are reviewed under an abuse of discretion standard. See, e.g., Clark v. Doe (1997), 119 Ohio App.3d 296,304.
Because the court in the present case had no duty to give interrogatories, we could hardly find that the court abused its discretion in rejecting them. This was also not a legally or factually complex case. And, as we said before, the court did properly instruct the jury on the elements of aggravated robbery and on the definition of a "deadly weapon." Accordingly, a new trial was not warranted on this ground.
Since we have found no abuse of discretion by the trial court in rejecting the motion for new trial, the third assignment of error is overruled.
Based on the preceding discussion, all three assignments of error are overruled and the judgment of the trial court is affirmed.
WOLFF, P.J., and GLASSER,* J., concur.
* Honorable George M. Glasser, Retired from the Sixth District Court of Appeals, Sitting by Assignment of the Chief Justice of the Supreme Court of Ohio.