JOURNAL ENTRY and OPINION
Defendant-appellant Andre Taylor appeals from his convictions for murder with a firearm specification and having a weapon while under disability.
Appellant challenges his convictions on the grounds that they are supported by neither sufficient evidence nor the weight of the evidence. This court thoroughly has reviewed the record with appellant's challenge in mind. Although appellant's challenge with respect to his conviction for having a weapon while under disability has merit, appellant's conviction for murder is supported by both sufficient evidence and the weight of the evidence. Appellant's conviction for murder, therefore, is affirmed. Appellant's conviction for having a weapon while under disability is vacated.
Appellant's convictions result from a shooting incident that occurred at the "Phase III Lounge"[1] on September 20, 1999. The Phase III was a "bar" located at the southwest corner of Buckeye Road and East 112th Street in Cleveland, Ohio, where people could both drink and dance. On the night in question, the bar was crowded.
Jermaine Patterson was one of the customers at the Phase III that night. Patterson lived only a short distance away and considered himself a "regular customer." He carried with him a video camera, intending to comply with an out-of-town relative's request to "videotap[e] the inside" of the place. Patterson, a few nights earlier, had taped a short segment which showed the patrons on the dance floor.
At approximately 2:00 a.m., however, Patterson noticed a "commotion" had started between some of the other customers. He decided to go out to the rear parking lot. After a short time, he noticed the "commotion" had moved outdoors. Curious, Patterson turned on his video camera and walked toward the front of the Phase III.
Initially, Patterson filmed an irate woman who stood at the southeast corner of East 112th Street and Buckeye Road. The woman repeatedly kicked a vehicle parked at the curb until it was driven away. Patterson then proceeded to the main entrance of Phase III Lounge, which faced Buckeye Road. Patterson saw that, to the east of the large crowd of people that had exited the bar, a fight was underway. He began to videotape the incident.
The two combatants were an unlikely pair: one was tall, heavy and well-dressed and the other shorter, slighter and more casually attired. Patterson recognized the shorter man as Dante Childs, with whom he had attended high school.
As the two traded blows, they moved westward along Buckeye, passing Patterson's location. Patterson attempted to keep the fight in view in spite of the many people milling about.
After a few moments, Patterson heard a shot fired from somewhere to his right. He paused the videotape momentarily to move further into the doorway for protection, then resumed his filming of the fight. As he did so, he saw through the camera's viewfinder a man among the onlookers on the opposite side of the street detach himself from the crowd. The man, who was dressed in a red T-shirt and grey sweat pants, ran to a nearby residential driveway where a dark blue "Monte Carlo" with a white roof was parked. The vehicle's license plate was distinctive, bearing the legend "4 JIMMY." The man appeared briefly to reach inside the driver's side of the vehicle, then emerged and quickly ran around the rear of it to return to the north sidewalk.
The man now grasped in his right hand a "shiny" object Patterson realized was a gun. The man stepped up near the rear of a "gray four-door Buick" parked on Buckeye Road, raised his right hand, pointed the gun in a southeasterly direction, then fired it.
Patterson at that point stopped his video camera. He saw the shooter across the street leap into the gray automobile, which was driven away. Patterson thereafter heard two more shots fired in the area.
The shots also were heard by two Cleveland police officers who had been investigating complaints of drug activity in the area of Buckeye Road and East 112th Street. The officers, John Cole and Carlos Robles, earlier had placed themselves in a fenced-in school bus parking lot located across Buckeye Road from the Phase III. They had observed the large crowd emerge from the bar and could see a fight had started. When they heard the gunfire, however, they radioed for assistance, then retrieved their vehicle.
Upon their arrival at the intersection, the officers ascertained that two people had been shot in the melee. Cole and Robles thereupon detained some of the people they knew had witnessed the incident, including Jermaine Patterson and Patterson's young cousin, Anthony Burns.
Burns also had been standing outside of the Phase III that night. Prior to the shooting, he had seen not only the fight between Haynes and Childs but also a fight between appellant's friend "Mario" and another person. That fight had been taking place "in the intersection of 112th," and appellant had been trying to aid Mario before the first shot was fired. Burns believed appellant's reaction to the shot was an enthusiastic endorsement of it, but Burns ran for cover before the remaining gunfire took place.
As the police officers began their investigation of the shootings, they obtained from Patterson his video camera and located two spent shell casings lying on Buckeye Road.
The two shooting victims later were identified as Rommel Acy and Daryl Haynes. Acy had been struck by a bullet near his automobile; Acy's automobile was parked on the south side of Buckeye Road just east of East 112th Street. The bullet pierced Acy in the upper right chest and penetrated his liver, diaphragm, aorta and left lung before exiting his body. Acy reached his automobile, collapsed into the driver's seat and quickly died. The bullet that killed him never was recovered.
Haynes had been Childs' opponent in the fight. When the second shot had been fired, Childs had broken away from the struggle. Haynes at that point had walked back toward his vehicle parked at the north side of Buckeye Road straddling the pedestrian crosswalk just east of East 112th Street. Preoccupied, he had not paid a great deal of attention to the sound of additional gunfire. When he reached his vehicle, however, Haynes found that he could not retrieve his keys because his "arm wouldn't move." He glanced down at his right arm, noticed blood was coming from a wound, and also observed the fabric of his shirt sleeve was embedded into his skin in another spot. When he pulled at the fabric, a "bullet came out" of the second wound. Haynes saved the bullet, and a friend transported him to the hospital. The bullet did not match the two shell casings found lying on the road.
Despite obtaining information from witnesses concerning some of the persons and automobiles present at the scene on the night of the incident, and despite having possession of Patterson's videotape, Gregory King, the police detective in charge of the investigation of the shootings, had little success in eliciting either descriptions or identifications of anyone who had fired a weapon. However, King was notified on October 7, 1999 that someone had come forward claiming he had information regarding Acy's homicide. King proceeded to interview James Scott.
Scott, who had a lengthy criminal record, stated he had been a customer at the Phase III on the night of the incident. He stated he had had several drinks and had seen some people he knew there, including Childs, who at the time was "arguing" with someone, Haynes, and appellant. Scott indicated he left the bar just prior to it closing in an attempt to "beat the traffic" but had managed only to pull out of his parking space on East 112th Street when several groups of people standing in Buckeye Road began fighting, thus preventing any vehicular movement.
Scott was seated in his automobile facing northward, the second or third in line at the stop sign. Unable to proceed, Scott observed Childs and Haynes fighting in Buckeye Road to his left. They continued to move westward as they struggled, and Scott lost sight of them. However, as Scott watched that area, the movements of a man on the north sidewalk of Buckeye Road "behind a dark car" caught his attention. The man seemed to "bend over", then pointed a gun in Scott's general direction and "started shooting toward the crowd."
Scott believed two shots were fired, but he ducked down inside his automobile for protection as the shooting began. Additional shots were fired; this led to a thinning of the crowd in the road as people fled. Traffic began moving; thus, Scott soon was able to make his right turn onto Buckeye Road. As he drove away, he saw Rommel Acy collapsed behind the wheel of a vehicle parked on Buckeye Road.
Scott told King he had not come forward previously because he did not "really want to be around the scenery." Scott identified appellant as the man he had seen fire the gun toward the crowd that night. Subsequently, Scott also chose appellant's picture from a photographic array and further identified appellant in Patterson's videotape. King initially did little with Scott's identification of the shooter, however, since King was pursuing other "leads."
On March 2, 2000 King located Bobby Jones, owner of a "gray LeSabre, four-door" automobile and possibly the "getaway driver." During King's interview of him, Jones admitted he had been at the Phase III on the night of the incident but denied any involvement. However, Jones provided an oral statement to King.
Jones stated he previously had seen appellant in the neighborhood and had seen him at the bar that night. Jones stated appellant was wearing "gray jogging pants and a red T-shirt." Jones indicated that when the fighting occurred outdoors between Childs and Haynes, he watched from "in front of the Phase III." After the first "warning" shot had been fired, however, Jones crossed East 112th Street to stand on the opposite corner. This location was in proximity to Acy's vehicle. Jones stated he saw appellant involved in a confrontation nearby and further stated he heard appellant at that time mention a "gat" and saw that "somebody handed him a gun." As appellant pointed it in his direction, Jones immediately fled southward on East 112th Street; he heard shots fired behind him as he ran. Although Jones did not know appellant's name, he chose appellant's picture from a photographic array and positively identified him as the man he had seen with the gun.
On March 24, 2000 the Cuyahoga County Grand Jury issued a three-count indictment against appellant as follows: (1) aggravated murder of Rommel Acy, R.C. 2903.01(A), with two firearm specifications; (2) felonious assault upon Daryl Haynes, R.C. 2903.11, with two firearm specifications; and (3) having a weapon while under disability, R.C.2923.13. Count Three alleged appellant had been convicted in 1995 of the crime of "Drug Trafficking." Appellant entered pleas of not guilty to the charges.
In September 2000, just prior to the scheduled date of appellant's trial, two significant events occurred. First, Patterson stated he had known appellant was the shooter in the videotape but had been afraid to make the identification earlier. Second, the state dismissed Count Two of appellant's indictment. This latter action was taken when forensic analysis of the bullet recovered from Haynes' shirt indicated that bullet did not match the range of calibers of the bullets which could have caused Acy's fatal wound. At that time, appellant requested Count Three of the indictment be tried to the court.
Although appellant's case then proceeded to trial, the jury was unable to reach a verdict on Count One. The trial court, therefore, declared a mistrial in the case. On January 16, 2001 appellant's second trial commenced.
During its case-in-chief, the state presented the testimony of the following witnesses: Patterson; the assistant coroner who had performed Acy's autopsy; Officer Cole and another officer who investigated the scene on the night of the incident; the forensic analyst who examined the recovered bullet and shell casings; Haynes; Scott; Burns; Jones; and Detective King. The state also presented the testimony of Hugh Aylward, an "imaging technician" employed at the NASA-Glenn Research Center.
Aylward had examined Patterson's videotape and had rendered it into a complete series of "stills," thus permitting it to be observed "frame by frame." Eventually, both Patterson's videotape and Aylward's rendition of it were introduced into evidence as "Court's Exhibits." The state also introduced into evidence numerous photographs, the victim's autopsy report, the recovered bullet and shell casings, and a police sketch of the scene.
Following the trial court's denial of his motions for acquittal, appellant presented the testimony of two additional witnesses. Ransene Wiley stated she was an "associate" of appellant's who had been at the Phase III on the night of the incident. She stated she spoke to appellant as she stood in front of the bar during the Childs/Haynes fight. She further indicated she did not see appellant with a gun; rather, she saw only that appellant drove off in his own vehicle rather than a gray one.
Thomas Pavlish, the defense investigator, also testified. He indicated that when he questioned two of the state's witnesses regarding their recollections of the incident, they had provided details that differed from their recent testimony.
The jury ultimately returned a verdict against appellant of guilty of the crime of murder with a firearm specification, a lesser-included offense of Count One of the indictment. Without discussion, the trial court pronounced appellant guilty also of Count Three. The trial court thereafter sentenced appellant to a term of incarceration of three years for the firearm specification, to be served prior to and consecutive with concurrent terms of fifteen years to life on Count One and one year on Count Three.
Appellant presents the following as his sole assignment of error:
 THE EVIDENCE PRESENTED AT TRIAL WAS INSUFFICIENT TO SUPPORT A CONVICTION FOR MURDER WITH A GUN SPECIFICATION AND/OR HAVING A WEAPON WHILE UNDER DISABILITY AND THE JURY'S AND COURT'S VERDICTS WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
Appellant asserts his convictions are supported by neither sufficient evidence nor the weight of the evidence. Appellant's assertion, however, has merit only with respect to his conviction for having a weapon while under disability.
Appellant first argues the trial court improperly overruled his motions for acquittal on the basis the state failed to provide "physical evidence" that linked him to Acy's murder.
 The standard for determining whether a motion for acquittal is properly denied is set forth in State v. Bridgeman (1978), 55 Ohio St.2d 261, 9 O.O.3d 401, 381 N.E.2d 184, syllabus, as follows:
 Pursuant to Crim.R. 29(A), a court shall not order an entry of judgment of acquittal where the evidence is such that reasonable minds can reach different conclusions as to whether each material element of a crime has been proved beyond a reasonable doubt.
 A motion for judgment of acquittal under Crim.R. 29(A) should be granted only where reasonable minds could not fail to find reasonable doubt. State v. Bridgeman, supra; State v. Martin (1985), 19 Ohio St.3d 122, 130, 19 OBR 330, 337, 483 N.E.2d 1157, 1165.
State v. Apanovich (1987), 33 Ohio St.3d 19, 23. See, also, Statev. Dennis (1997), 79 Ohio St.3d 421.
The evidence must be viewed in a light most favorable to the prosecution. State v. Martin (1983), 20 Ohio App.3d 172. Thus, a reviewing court will not reverse a verdict where there is substantial evidence upon which the trier of fact reasonably could conclude that all the elements of an offense have been proven beyond a reasonable doubt. State v. Eley
(1978), 56 Ohio St.2d 169; State v. Jenks (1991), 61 Ohio St.3d 259.
Appellant ultimately was convicted by the jury of violation of R.C.2903.02, which prohibits a person from purposely causing the death of another. "Purpose" is defined in R.C. 2901.22(A) as the specific intent to cause a certain result. A jury may presume an intent to kill where the natural and probable consequence of a defendant's act is to produce death and the surrounding circumstances support a conclusion the defendant had an intent to kill. State v. Edwards (1985), 26 Ohio App.3d 199.
This court and other appellate courts in this state previously have held that the act of pointing a functioning firearm at a group of individuals and then shooting it at them will support the element of "purpose" contained in R.C. 2903.02. See, State v. Holly (July 8, 1999), Cuyahoga App. No. 74452, unreported; State v. James (Sept. 24, 1998), Cuyahoga App. No. 72922, unreported; State v. Smith (1993),89 Ohio App.3d 497.
In this case, the testimony of the witnesses established the following: Both Burns and Jones had seen appellant in a confrontation in which he seemed to be defending his friend Mario. Burns heard appellant approve of the firing of what Jones termed the "warning shot." Burns, Jones, Scott and Patterson all saw appellant then quickly obtain a gun. Burns, Scott and Patterson observed appellant point and fire the weapon in a southeasterly direction toward the intersection of East 112th Street and Buckeye Road. This was the location of the fight in which appellant just had been engaged. At the time this occurred, Haynes remained west of appellant. Moments later, Acy, shot through the heart, collapsed inside his automobile and died. Acy's automobile was parked on the south side of Buckeye Road, just east of East 112th Street. Acy had been shot by a weapon of a different caliber than the one that caused Haynes' wounds.
Viewing this evidence in a light most favorable to the prosecution, rational factfinders reasonably could conclude that appellant was seeking revenge and deliberately fired the gun toward the people with whom he had been fighting but that the bullet instead struck and killed Acy. Thus, a rational factfinder could have found the essential elements of the crime of murder were proven beyond a reasonable doubt. State v. Dennis, supra;State v. Holly, supra. Since it is within the province of the jury to choose between competing constructions of the evidence and an appellate court will not substitute its judgment for that of the jury, the trial court did not err in overruling appellant's motion for acquittal with respect to Count One of the indictment. State v. Jenks, supra, at 273.
The record, however, demonstrates the trial court improperly denied appellant's motion for acquittal with respect to Count Three. In order to establish appellant's guilt of the crime of having a weapon while under disability, the state was required to furnish evidence of appellant's earlier conviction for "Drug Trafficking." Nowhere in the record does that evidence exist. The state neither provided a certified copy of such a judgment nor obtained appellant's stipulation to the fact of the conviction.[2]
Under these circumstances, appellant's conviction on Count Three must be vacated.
Appellant next argues his conviction for murder is unsupported by the weight of the evidence. Appellant contends the testimony of the eyewitnesses was so conflicting as to be completely unreliable. This court disagrees.
In State v. Thompkins (1997), 78 Ohio St.3d 380 at 386, the Ohio Supreme Court indicated the correct test to be utilized when addressing the issue of manifest weight of the evidence was set forth in State v.Martin (1983), 20 Ohio App.3d 172, as follows:
 There being sufficient evidence to support the conviction as a matter of law, we next consider the claim that the judgment was against the manifest weight of the evidence. Here the test is much broader. The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. * * * See Tibbs v. Florida (1982), 457 U.S. 31, 38, 42, 72 L.Ed.2d 652, 102 S.Ct. 2211.
(Emphasis added.)
It is axiomatic, however, that the weight of the evidence and the credibility of the witnesses are primarily for the trier of fact. Statev. DeHass (1967), 10 Ohio St.2d 230, syllabus 1.
A review of the record in this case demonstrates appellant's convictions for murder and having a weapon while under disability were in accord with the manifest weight of the evidence.
The state's witnesses presented logical and, in view of the rapidity of the sequence of events that occurred, coherent descriptions of the circumstances surrounding the shooting of Rommel Acy. The differences in the eyewitnesses' recollections is explained by the short period of time involved, the size of the crowd in the area, the different perspectives from which they viewed the events, and their relative degrees of sobriety. Each of the eyewitnesses was positive in his identification of appellant as the shooter, and their testimony in this regard is corroborated by the videotapes and the other physical evidence introduced by the state. Appellant's witnesses, on the other hand, gave recountings during their testimony that seemed either biased, trivial or hostile.
The state presented reliable, credible evidence of appellant's guilt, and this court declines appellant's request to substitute its own judgment concerning the credibility of the witnesses and the weight to be given to their testimony. This court, therefore, cannot say that on the basis of the evidence the jury "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." State v. Martin, supra at 175. The verdict of guilty was, thus, not against the manifest weight of the evidence. State v.Robinson (1999), 132 Ohio App.3d 830; see, also, State v. Allen (1996),115 Ohio App.3d 642.
Accordingly, appellant's assignment of error is overruled in part and sustained in part.
Appellant's conviction and sentence for murder with a firearm specification is affirmed. Appellant's conviction and sentence for having a weapon while under disability is vacated.
It is ordered that appellee and appellant share equally in the costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the Cuyahoga County Court of Common Pleas to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
DIANE KARPINSKI, A.J. and MICHAEL J. CORRIGAN, J. CONCUR
[1] Quotes indicate testimony given by a witness at appellant's trial.
[2] Presumably, one of these methods was utilized at appellant's first trial, but the matter subsequently was neglected.