JOURNAL ENTRY AND OPINION
{¶ 1} A jury found defendant-appellant, Peter Kenney, guilty of aggravated murder in violation of R.C. 2903.01 with an accompanying firearm specification, and kidnapping, in violation of R.C. 2905.01, which also carried a firearm specification.[1] He now appeals those convictions, which we affirm for the reasons that follow.
 {¶ 2} The facts leading to this appeal arise from the execution-style killing of 17-year-old Terrence Robinson on April 17, 2001 Just before dawn on the 17th, police responded to a call about "gunshots in the area and a male down in the backyard" at 3370 W. 95th Street, Cleveland, Ohio. Tr. 238.
 {¶ 3} At trial, police officer Gary Helshel testified he was one of the first officers to arrive at the scene. Officer Helshel entered the backyard at 3370 W. 95th and discovered Robinson's partially nude and lifeless body face down. Tr. 239-240. Detective Michael O'Malley described how Robinson was found clad in his underwear with other pieces of clothing strewn near his body. Tr. 239-240, 614-616.
 {¶ 4} An autopsy revealed that Robinson had been shot seven times in different parts of his body. One close-range gunshot wound was found in the top of his head. The coroner testified that of the seven gunshot wounds the one in the top of Robinson's skull was fatal. Tr. 293, 296, 340. The coroner estimated that when that shot was fired, the gun was probably about 12 inches away from Robinson's head. Tr. 305. The head wound was the last of the seven gunshot wounds Robinson endured. Before that shot, Robinson was still alive but had been immobilized by the six other bullets, several of them fired into his lower extremities. Tr. 255-256, 273, 380.
 {¶ 5} Robinson was killed in the backyard of the house where Renee McBride lives. She told the jury that Robinson sometimes stayed at her house and that, as of the 17th, he had been living there for about a month. On the morning of the shooting, McBride testified she heard two gunshots, heard Robinson crying for help, and then heard four more shots. Tr. 255-256.
 {¶ 6} Timmon Black, visiting at his girlfriend's house on W. 95th on the 17th, testified that he awoke when he heard gunshots around 4:00 a.m. Black described what he saw when he looked out the window towards McBride's backyard: "I saw two guys standing off to the side and then I saw the guy laying on the ground * * * and then a guy just popped out of nowhere like a ghost, came from around the other two guys * * * and shot him and they ran off." Tr. 380-381. Black stated the man who came out of nowhere was "[a]bout a foot" away from Robinson when he fired the gun. Tr. 384. Even though there was very little illumination, Black was able to identify the shooter as a white male because "as he jumped up to go away * * * the hood come back * * * you could see that white face in the dark." Tr. 383-386. Lynette Schirger, who lives on W. 97th, testified that defendant was known in the neighborhood as "Shorty." Schirger told the jury that when she awoke on the 17th between 10:00 a.m. to 11:00 a.m., Shorty, her friend, was visiting her live-in boyfriend, Daniel Fox. According to Schirger, Fox and some friends, including defendant, had gone out the night before the shooting to get high. Tr. 410-412. When she spoke with defendant the next morning, Schirger stated that he was still "high." Tr. 416. Schirger described her conversation with defendant that morning:
 {¶ 7} "Q: He was still under the influence of whatever he had used?
 {¶ 8} "A: Yes.
 {¶ 9} "Q: Describe how you could tell that over and above the eyes?
 {¶ 10} "A: The slur of his speech, his eyes, his eyes just kept moving like he couldn't keep them still focused on one thing. He just kept rolling them around and stuff.
 {¶ 11} "Q: Did Shorty say anything to you?
 {¶ 12} "A: He was all hyped up and he started talking about how he murdered the black boy.
 {¶ 13} "Q: Did he use the term black boy?
 {¶ 14} "A: No.
 {¶ 15} "Q: What term?
 {¶ 16} "A: He used the term nigger.
 {¶ 17} "Q: What exactly did Shorty say to you?
 {¶ 18} "A: That he murdered the nigger and that's what he deserved.
 {¶ 19} "* * *
 {¶ 20} "Q: Did he use a name * * * did he say a name of the person he shot?
 {¶ 21} "A: Yeah. I specifically asked who and he said Terrence.
 {¶ 22} "* * *
 {¶ 23} "Q: What else does he say? Does he say where he did this?
 {¶ 24} "A: He didn't specifically say which backyard, he just said it was in a backyard.
 {¶ 25} "Q: What else did Shorty say other than it was in a backyard?
 {¶ 26} "A: That the kid was face down in a mud hole and that he was stripped down to his boxers." Tr. 417-420.
 {¶ 27} Bothered by defendant's statements, Schirger asked him to leave. Defendant remarked, "[I]f you don't believe me watch the news." Tr. 420. When Schirger watched the news, she did, in fact, see footage on Robinson's murder. Later, Schirger met with police and from a police photo array identified the defendant's photograph as that of Shorty. Tr. 423-424.
 {¶ 28} Schirger's boyfriend, Daniel Fox, was called as a court witness. According to him, defendant had arrived at the house in the early morning hours of the 17th. Two weeks after Robinson's murder, Fox gave a written statement to police in which he said he had gotten high with defendant the night before Robinson's murder. When defendant left that night he was so high he "could barely walk." Fox went to bed and was asleep when defendant arrived at the house around 3:00 a.m. Fox opened the door and saw defendant hand a gun to another person who was also standing outside with him. After entering the house, defendant admitted to Fox he had killed Robinson. During examination by the state, however, Fox claimed police had threatened to charge him with Robinson's murder if he did not make the statement incriminating defendant.
 {¶ 29} Bonnie Cozart also lived in the W. 95th neighborhood and knew defendant. Two days after Robinson's shooting, Cozart spoke with defendant and recalled that conversation to the jury:
 {¶ 30} "Q: Now, tell the jury, ma'am, what did he tell you that day, two days after this murder, what did he tell you?
 {¶ 31} "A: Okay. I stopped because I said hey what's up, Shorty. He said not much. Did you hear about what happened the other night? I said what? The kid that got shot. He said yeah. He said, we shot him. I said why did you do something like that? The kid pissed us off, so we shot him." Tr. 477-478. Cozart stated that, after this conversation, she did not see defendant around the neighborhood at all.
 {¶ 32} Police eventually learned that, on the same day as Robinson's murder, defendant had asked a friend to take care of his dog. Defendant's whereabouts remained unknown until on or about May 5, 2001, when he indicated a desire to surrender to police.
 {¶ 33} Following his convictions, defendant filed this appeal, assigning two errors for our review.
 ASSIGNMENT OF ERROR NO. I: {¶ 34} "The Trial Court Erred And Denied The Defendant-appellant, Peter Kenney His Right To Due Process Of Law By Permitting The Prosecuting Attorney To Cross Examine The State Witness Daniel Fox With A Prior Written Police Statement Without First Requiring The State Of Ohio To Establish Surprise And Affirmative Damage."
 {¶ 35} Defendant contends the trial court committed reversible error by allowing the state to try to impeach Fox with a prior written statement in which he said that defendant had admitted killing Robinson on April 17, 2001.
 {¶ 36} First, we underscore the fact that Fox was called as a court witness, not a witness for the state. In State v. Apanovitch
(1987), 33 Ohio St.3d 19, 22, the Ohio Supreme Court stated, "[A] trial court possesses the authority in the exercise of sound discretion to call individuals as witnesses of the court." Evid.R. 614 also provides that a court may call witnesses on its own motion and allow each party to then cross-examine those witnesses. The state need not demonstrate surprise in order to cross-examine such a witness." Apanovitch at 22, citing Statev. Adams (1980), 62 Ohio St.2d 151, 404 N.E.2d 144, paragraph four of the syllabus.
 {¶ 37} Under Evid.R. 614, therefore, our inquiry focuses on whether the trial court abused its discretion when it called Fox as a witness and then permitted the state to cross-examine him about his prior statement to police. "The term `abuse of discretion' connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary, or unconscionable." Apanovitch, supra.
 {¶ 38} In the case at bar, the record shows that even before the trial began, defense counsel stipulated to the court calling Fox as its own witness and to both sides being permitted to cross-examine him. Defendant understood that though the state would attempt to impeach Fox with his prior written statement to police, it would not argue to the jury in closing that the statement was substantive evidence. Tr. 8-10. As part of the agreement, the state would not object to a limiting instruction in which the jury was told Fox's written statement should be considered only for purposes of assessing his credibility, not as substantive evidence of defendant's guilt. Tr. 10, 742-743.
 {¶ 39} Given defense counsel's voluntary agreement to allow the state to try to impeach Fox with his prior statement and to cross-examine him under Evid.R. 614 without demonstrating surprise, we do not find the trial court abused its discretion. We believe the trial court's decision was not unreasonable, arbitrary, or unconscionable. Accordingly, defendant's first assignment of error is overruled.
 ASSIGNMENT OF ERROR NO. II: {¶ 40} "The Conviction Of The Defendant-appellant, Peter Kenney For The Offenses Of Aggravated Murder And Kidnapping Was Contrary To The Manifest Weight Of The Evidence."
 {¶ 41} Defendant argues the manifest weight of the evidence does not support his convictions. When an appellate court decides whether a verdict is against the manifest weight of the evidence, the court reviews "the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." State v. Stewart (Nov. 19, 1998), Cuyahoga App. No. 73255, 1998 Ohio App. LEXIS 5462, *28, citing State v.Thompkins (1997), 78 Ohio St.3d 380 at 386, 678 N.E.2d 541.
 {¶ 42} Defendant was convicted of aggravated felony murder and kidnapping). R.C. 2903.01(B), the statute for aggravated felony murder, in relevant part, provides: "No person shall purposely cause the death of another * * * while committing or attempting to commit, or while fleeing immediately after committing or attempting to commit, kidnapping * * *."
 {¶ 43} Ohio's kidnapping statute, R.C. 2905.01(A)(2), requires the state to establish that defendant "by force, threat, or deception * * * removed another from the place where the person is found or restrained the liberty of another person" to "facilitate the commission of any felony or flight thereafter."
 {¶ 44} In this assignment, defendant focuses solely on whether there was evidence linking him to the crime of homicide. The purposeful nature of Robinson's murder is evident from the record in this case. Black testified that, when he heard gunshots, he looked out his window and saw a white male shoot Robinson from "[a]bout a foot" away. Tr. 384. The coroner confirms the close-range of the last and fatal gunshot Robinson suffered. When fired, the gun was probably as close as twelve inches from Robinson's skull. Tr. 305. There is further evidence that Kenney acted deliberately. Although it was the month of April, Robinson's body was found clothed only in underwear with the rest of his clothing on the ground nearby. Tr. 239-240, 614-616. This evidence establishes that the assailants took the time to make Robinson disrobe either before or while they fired the first six bullets into his body.
 {¶ 45} Defendant's identity as a participant in Robinson's death is not in question. Only hours after the murder, defendant personally described to Schirger salient facts about Robinson's body, including its location, position, and condition. There is no evidence that defendant could have obtained this information other than by personally being at the scene of the killing. Further, defendant specifically identified Robinson as the victim, when defendant stated "he murdered the black boy" and then referred to him as "Terrence." Tr. 417-424.
 {¶ 46} The time of the murder, moreover, is consistent with defendant's activities. Daniel Fox testified that defendant arrived at his house in the early morning hours of the 17th, the same time frame Robinson was killed. Tr. 508. There is evidence defendant had a gun. Fox described defendant as handing a gun to another person before he entered the house and then, once inside, admitting he killed Robinson. Tr. 500-501, 508, 510. Moreover, his admission to Fox is repeated to Cozart. Like Schirger, Cozart also spoke to the defendant shortly after Robinson's murder. Cozart recalled defendant's nonchalant admission that he and his cohorts killed Robinson because he had irritated them. Tr. 477-478.
 {¶ 47} Given the evidence before us, we determine that the jury did not lose its way in concluding defendant purposely caused Robinson's death. The record also supports a determination that not only did defendant purposely cause Robinson's death, he did so while committing or attempting to commit kidnapping.
 {¶ 48} The coroner testified that Robinson had been shot seven times in different areas of his body, but that the gunshot to his head was the fatal wound. Tr. 293, 296, 340. McBride testified she heard two gunshots, heard Robinson crying for help, and then heard four more shots. Tr. 255-256. From this testimony, it is evident that before the fatal wound was inflicted, Robinson was alive calling for help, but was unable to escape because of the shots fired into his lower body and legs. Tr. 255-256, 273, 380. This restraint is an element of kidnapping.
 {¶ 49} In light of the above, the manifest weight of the evidence clearly identifies the defendant as the perpetrator of Robinson's death. Defendant's second assignment of error is, therefore, without merit and overruled.
 {¶ 50} The judgment of the trial court is affirmed.
ANNE L. KILBANE, P.J., AND COLLEEN CONWAY COONEY, J., CONCUR.
[1] Defendant was originally indicted on four counts. Count 1 charged aggravated murder with prior calculation and design; Count 2 charged aggravated murder; Count 3 was for aggravated robbery; and Count 4 charged kidnapping. Defendant was acquitted on counts 1 and 3.