JOURNAL ENTRY AND OPINION *Page 3 
{¶ 1} Appellant Jeffrey Perkins, Jr. appeals his convictions following a bench trial in the East Cleveland Municipal Court. Perkins assigns the following errors for our review;
 "I. The defendant-appellant was denied his right to due process of law when he was convicted of domestic violence, which was against the manifest weight of the evidence because there was no evidence that any of the victims in this case were `family or household members'."
 "II. The defendant-appellant was denied his right to due process when he was convicted of domestic violence based upon sufficient evidence."
 {¶ 2} Having reviewed the record and pertinent law, we reverse Perkins's conviction under assigned error two. The apposite facts follow.
 {¶ 3} On February 11, 2008, based on complaints of verbal altercations between Perkins and his sisters, the East Cleveland Police were summoned twice to the home where Perkins resided with his mother. The police arrested Perkins the second time they were summoned. Perkins was subsequently charged with two counts of threats of domestic violence and a temporary protective order was put in place. On February 28, 2008, a bench trial followed.
 Bench Trial {¶ 4} At trial, the evidence produced through the testimony of Perkins's three sisters, as well as through Perkins, established that all four siblings had grown up in the home where the police were summoned. Perkins's mother was chronically ill, had undergone a bypass surgery operation, and was suffering from breast and lung *Page 4 
cancer. One or more of Perkins's three sisters visited the home each day to assist with their mother's care.
 {¶ 5} At the trial, Perkins's sister, Carol Perkins-Treadwell, testified that she is the primary care giver for their mother. According to Perkins-Treadwell, for the past three years she has been visiting with her mother on a daily basis to administer her medication, bring her groceries, or take her to her doctor's office. Perkins-Treadwell stated that over the past year, her brother had become increasingly belligerent as a result of abusing alcohol or drugs and several verbal altercations had ensued.
 {¶ 6} Perkins-Treadwell testified about a verbal altercation, which occurred on February 11, 2008, as follows:
 "Q. So what did he do?
 A. Well, my sister and I went upstairs because the officer went upstairs to talk to my mother.
 Q. What did your brother do?
 A. He bust out of the room and say, `What the F do you want' and all this. You know, very aggressive and in a threatening manner, that the police had to take him downstairs."[1]
 {¶ 7} Another sister, Gail Guy-Perkins, testified that she visited their mother every third day to assist with her medical and social care. According to Guy-Perkins, on the morning of February 11, 2008, she learned that Perkins had been drinking, *Page 5 
was very belligerent, and was causing a disturbance. As a result, she decided to call the police and then proceeded to the home.
 {¶ 8} When Guy-Perkins arrived at their mother's home, she discovered that the police had come to the house, but had left. She stated that she went to the East Cleveland Court to initiate an eviction action against her brother. She stated that the police followed her back to the house.
 {¶ 9} According to Guy-Perkins, when she returned to the house, she proceeded upstairs to check on their mother. On the way, she encountered Perkins, whose room is next to their mother's. Perkins stated: "Don't ask me nothing and get the F away from my door."[2]
 {¶ 10} According to Guy-Perkins, Perkins is 53 years old, does not work, is supported financially by their mother, and does nothing to help with her medical or social care.
 {¶ 11} A third sister, Andreia Barnes, testified that after leaving work on the morning of February 11, 2008, she went to their mother's house. Her brother answered the door and asked what she was doing there, but she walked past him and proceeded to their mother's room. A short while later, her two sisters arrived with the police. One sister knocked on Perkins's door, and he proceeded to curse at her.
 {¶ 12} Barnes testified as follows about the ensuing events: *Page 6 
 "Q. What behavior did your brother exhibit when you got there?
 A. Well, when I get [sic] there, when he asked me what I was doing there, he first went upstairs, and then came back down. I was upstairs talking to my mom. And so he was quiet then. And when my sisters and them came over, and he — they — he started with her. They started at each other, and —
 Q. Started at each other? What specifically do they say?
 A. Just cussing and everything, and —
 Q. Did you see him threaten your sister in any way?
 A. I didn't see that.
 Q. Okay. What did you see?
 A. He was cussing and acting erratic, as always."[3]
 {¶ 13} Perkins testified in his own defense that he holds a doctorate degree from the University of Pittsburgh and works as an independent contractor consulting with groups. Perkins testified that he has argued with his sister, Gail, on several occasions. Perkins testified as follows about the argument on February 11, 2008:
 "Q. All right. So any arguments on this particular date wouldn't have been out of the ordinary, you've argued with her before?
 A. Not out of the ordinary because of Gail's mouth. And you just don't know. But anyway, its not out of the ordinary for Gail to go ballistic.
 Q. Okay. You did nothing on this particular date to threaten them? *Page 7 
 A. No.
 Q. You didn't raise your fist?
 A. No, no. Mr. Dawson, I did not threaten my sister. Even Andreia said I was not out of control. I was not threatening. That's what she said initially. But the way Gail and Carol told it —
 Q. Let me ask you, you used curse words?
 A. I don't recall using curse words. I don't recall using curse words.
 Q. But curse words —
 A. He's a dog. He's a son of a bitch. He's an LL. He's no good. He's broke. He's a bum. Every kind of word imaginable came out of Gail's mouth.
 Q. Okay. Just to be clear, you are charged with threatening your sisters, at any point did you threaten your sisters?
 A. No point at all. I wasn't even close to them. I was about as far away. I was about as far away, from further away from you than I was to them.
 Q. So you were at least maybe six feet away from them while you were having arguments with them?
 A. Yes, sir. Further than that probably, because there was no direct look. My sisters would attack me. Believe me. No. I was not close to them to be threatening where I would put my hands on anybody to hurt them."[4]
 {¶ 14} The trial court found Perkins guilty of both counts of domestic violence, sentenced him to 30 days in jail, gave him credit for time served, fined him $250 per count, and placed him on active probation. In addition, the trial court ordered *Page 8 
Perkins to attend anger management classes and undergo drug and alcohol assessment and treatment.
 Insufficient Evidence {¶ 15} Because the second assigned error disposes of the case, we will address it first. In the second assigned error, Perkins argues the trial court erred when it did not grant his motion for acquittal. We agree.
 {¶ 16} The sufficiency of the evidence standard of review is set forth in State v. Bridgeman:[5]
 "Pursuant to Criminal Rule 29(A), a court shall not order an entry of judgment of acquittal if the evidence is such that reasonable minds can reach different conclusions as to whether each material element of a crime has been proved beyond a reasonable doubt."[6]
 {¶ 17} Bridgeman must be interpreted in light of the sufficiency test outlined in State v. Jenks, [7] in which the Ohio Supreme Court held:
 "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence submitted at trial to determine *Page 9 whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. (Jackson v. Virginia [1979], 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, followed.)"
 {¶ 18} In the instant case, the trial court found Perkins guilty of domestic violence under the threat of force provision of R.C. 2919.25(C), which provides in pertinent part as follows:
 "No person, by threat of force, shall knowingly cause a family or household member to believe that the offender will cause imminent physical harm to the family or household member."[8]
 {¶ 19} This provision of the domestic violence statute contains the element of "imminence," which means "threatening to occur immediately."[9] R.C. 2901.01(A)(3) defines "physical harm" as "* * * any injury, illness, or other physiological impairment, regardless of its gravity or duration."[10] *Page 10 
 {¶ 20} After reading the trial transcript, we are satisfied that the evidence does not establish domestic violence, as defined above.
 {¶ 21} The testimony of Perkins's two sisters, who testified that he stated: "What the F**k are you doing here?" and "get the F**k out of my room," does not indicate that they were threatened with force. Even crediting the testimony of these two sisters regarding the above statement, the statement does not establish the threat of imminent physical harm element sufficient to satisfy the subsection (C) definition of domestic violence. Here, neither sister testified that she feared imminent physical harm as a result of the alleged statement. Neither sister testified that the statement was accompanied by any overt action that could constitute a threat of force.
 {¶ 22} Further, Barnes, Perkins's third sister, testified that she did not see Perkins threaten her two sisters and that both Perkins and Gail Guy-Perkins were cursing at each other. In addition, Barnes testified that Perkins was acting erratic and that it was not unusual, especially in light of his alcohol abuse.
 {¶ 23} Finally, the overwhelming evidence indicates that Perkins and his sister, Gail, had a contentious relationship. The alleged statement, which Perkins denies making, does not rise to the level constituting a threat of force resulting in imminent physical harm. Consequently, the trial court should have granted Perkins's motion for acquittal. Accordingly, we sustain the second assigned error. *Page 11 
 {¶ 24} Although we dispose of this matter under assigned error two, we are compelled to reiterate this district's view of whether the parties are family or household members within the meaning of the domestic violence law. We believe they are. The testimony showed that this was the family home and that, in the past, they all lived in the house together; although they do not presently reside together.[11] InState v. Gibson, [12] this court faced this question when a father was accused of attacking his daughter. In Gibson, we stated the following:
 "Under the everyday definition of family member, defendant's biological daughter would certainly qualify. For the purposes of this statute, however, the legislature has narrowed the definition of family member to children who live with or have lived with the offender. The First Appellate District has affirmed this interpretation: `R.C. 2919.25(F)(1)(a)(ii) [sic] provides that the child of an offender is a `family or household member' only if the child and the offender currently resides together or have resided in the past.' State v. Jorden (1999), 134 Ohio App.3d 131, 137, 730 N.E.2d 447. In Jorden, the court held that because the state had failed to prove that the defendant had ever lived with his daughter, the victim, he could not be convicted of domestic violence against her.
 In the case at bar, defendant, the daughter and the grandmother with legal custody of the daughter all testified that the daughter had never lived with defendant. Because the state failed to prove that the daughter was a family member under the definition of the statute, we vacate the conviction. * * *" *Page 12 
 {¶ 25} In this case, it is clear that the parties are family members and presently do not reside together. However, the city established that they had lived together in the past in the house where the alleged crime took place. Unless there is a narrowing of the residency requirement by the Ohio Supreme Court or the legislature, we will conclude that when the parties are a biological family and have lived together in the past, the domestic violence statute applies. However, because we believe assigned error two resolves this matter, our discussion of assigned error one is designed to reiterate this district's position that residency is an element of domestic violence.[13]
Judgment reversed, defendant discharged.
It is, therefore, considered that said appellant recover of said appellee his costs herein.
It is ordered that a special mandate be sent to said court to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure. *Page 13 
MARY EILEEN KILBANE, P.J., and FRANK D. CELEBREZZE, JR., J., CONCUR
[1] Tr. at 8.
[2] Tr. at 21.
[3] Tr. at 28.
[4] Tr. 43-44.
[5] (1978), 55 Ohio St.2d 261, syllabus.
[6] See, also, State v. Apanovitch (1987), 33 Ohio St.3d 19, 23;State v. Davis (1988), 49 Ohio App.3d 109, 113.
[7] (1991), 61 Ohio St.3d 259, paragraph two of the syllabus.
[8] State v. Green, Cuyahoga App. No. 90321, 2008-Ohio-3460.
[9] State v. Collie (May 29, 1996), 1st Dist. No. C-950640,108 Ohio App.3d 580.
[10] In re Jenkins, 5th Dist. No. 2003CA00330,2004-Ohio-2657.
[11] State v. Jorden (1999), 134 Ohio App.3d 131.
[12] Cuyahoga App. Nos. 844191, 84420, 2005-Ohio-1495.
[13] See State v. Alvey, Belmont App. No. 03BE24, 2003-Ohio-7006 (a niece and uncle are not residents for purposes of domestic violence law. The state must prove the essential element of domestic violence, residency.) *Page 1